UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **CRAIG M. WALKER,** | § | ___Civ.___ |
| **On Behalf of the 401k Plan, Himself and** | § | |
| **All Others Similarly Situated,** | § | |
| | § | **CLASS ACTION** |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Plaintiffs Demand A** |
| | § | <u>**Trial By Jury**</u> |
| **MERRILL LYNCH & CO. INC.,** | § | |
| **BANK OF AMERICA CORPORATION,** | § | |
| | § | |
| **Defendants.** | § | |

<u>**COMPLAINT FOR VIOLATIONS OF ERISA AND THE SHERMAN ANTITRUST LAWS**</u>

COMES NOW the Plaintiff Craig M. Walker, on behalf of the Clifford Chance US LLP 401(k) Plan and Amended Plans (the "Plan"), individually and on behalf of all others, similarly situated (both Plans and participants), by and through his own counsel, and, demanding a trial by jury, alleges the following:

**I.      INTRODUCTION**

1. On behalf of the Plan, Plaintiff brings this class action for violations of the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001 et. seq. against Merrill Lynch & Co. Inc., its current corporate parent Bank of America Corporation, fiduciaries under ER ISA for over $442 Billion in retirement assets in over 39,000 work place-based retirement programs including many thousands of 401k plans as wells as Individual Retirement Plans (IRA's) for over 6.5 million individuals. Clifford Chance

US LLP sponsored a 401(k) plan, of which plaintiff was a participant, beneficiary and account holder.  Merrill Lynch was the investment adviser of that Plan (from 1991 to 2006), and record keeper/administrator and plan investment menu provider (for the entire 1991-2015 period).

2. This action addresses the claims of those participants and account holders for 401k and IRA's for the period 1991 to the present who were subject to investment menu selections that were: (a) Merrill Lynch unregistered collective trusts with high fees, (b) mutual funds that were engaging in fee sharing or kickbacks to Merrill Lynch or the Plan Sponsor and (c) failed to include a complement of low fee offerings.

## II.  BACKGROUND

3. This action is filed after plaintiff made a claim to Clifford Chance US LLP, which claim was denied by the trustees of the Plan in March 2013.  Pursuant to the terms of the Plan, Plaintiff filed an appeal comply with deadlines (and without any documents having been provided by the fiduciaries) which Appeal was denied by outside counsel, on behalf of the Trustees, in August 2013. Accordingly, Class Plaintiff has fulfilled all the requirements of process under the Plan terms.

4. Significant developments have continued to occur, including a bulletin of the U.S. Securities Exchange Commission (SEC) highlighting the importance of low fees for long term overall performance, and the filings by the U.S Department of Labor in cases before the U.S. Court of Appeals, and the U.S. Supreme Court (the most recent was argued before the Supreme Court on February 25, 2015).

5. Plaintiff has also filed a petition and claim before Employment Benefits Security Administration ("EBSA") which has jurisdiction of the trustees for the Plan, but not the outside fiduciaries to the Plan like Merrill Lynch.

### III.   PARTIES

6. Class Plaintiff Craig M. Walker was a litigation partner of Rogers & Wells LLP (1990-1999) and after its merger with the London firm of Clifford Chance, was a litigation partner of Clifford Chance US LLP (2000-2003). In 2003 he became a retired partner (as 90% of the litigation partners transitioned to other legal positions), and formed his own firm. From 1991 to 2003 he was a participant in the 401k Plans, at which time he was improperly terminated (which is one of the subjects of the Petition to EBSA); he continued as a beneficiary and account-holder, to which ERISA fiduciary duties were owed to the current date.

7. Defendant Merrill Lynch Co. Inc., is a Delaware corporation, with its headquarters in New York City, which offered capital market services, investment banking and advisory services, wealth management, asset management and other services throughout the United States and world. While a stand-alone company it was a public company listed on the New York Stock Exchange. It was one of the big five investment banks before the mortgage backed financial crisis. It had a large number of financial advisors for client attention in offices around the United States which were known as the "Thundering Herd".

8. As an innovator Merrill Lynch developed the first Cash Management Account ("CMA") which brought checking, savings and credit card services into one account. The CMA

deposits could also be used to trade in securities. CMA's attracted billions of dollars in new investment.

9. Merrill Lynch was also adept in cross selling. Its Wealth Management Division used retirement assets such as the 401k as a vehicle to introduce participants to other Merrill Lynch services. Merrill focused on large accounts, which included top-heavy 401k plans or those with large account holdings.

10. The 2002 Merrill Lynch Annual Report sets out these characteristics of the company:

> "Global Private Client (GPC), led by James Gorman, is the world's premier provider of wealth management services- with more than \$1 trillion in client assets....Merrill Lynch's 14,000 Financial Advisors, the best trained force of its kind in the industry....
>
> Similarly, the retirement sector represents an important opportunity. Today, Merrill Lynch serves more than 21,000 workplace-based retirement programs, and more than 5 million with retirement accounts, a leading survey now ranks Merrill Lynch as one of the top- quality 401(k) providers. By continuing to address our client's comprehensive financial needs, diversifying revenues and focusing on service excellence, GPC is better positioned than ever to capture a growing share of industry profits worldwide."

11. In 2008, Merrill Lynch was caught holding the bag of mortgage backed bond and debt obligations. The financial crisis had started. Of its similarly distressed competitors, Bear Stearns arranged to be bought out by J.P. Morgan, Lehman Brothers went bankrupt, and Bank of America Corporation bought Merrill Lynch. Bank of America's President had longed to acquire the "Thundering Herd". That acquisition was made in 2009 (without Bank of America knowing the eyebrow-raising bonuses that the Merrill Lynch executives had granted to themselves).

12. Defendant Bank of America Corporation is a large national bank with its headquarters in Charlotte, North Carolina with operations in all 50 states. It is a public company listed on

4

the New York Stock Exchange. While it took over MerrillLynch in 2009, on October 1,2013, it completed the merger into bank of America as a subsidiary. This merger, as the 2013 Bank of America Annual Report states: "had no effect on the Merrill Lynch name or brand and is not expected to have any effect on customers or clients."

13. Bank of America holds Merrill as one of its five major subsidiary groups under the group heading "Global Wealth & Investment Management"along with US Trust, Bank of America Private Wealth Management.

14. As a Bank of America subsidiary, Merrill Lynch Global Wealth Management provides, through a network of financial advisors, services focused on clients with more than $250,000 in investable assets; US Trust focuses on clients with more than $5 million in investment assets and on the lower end Merrill Edge focuses on clients with less than $250,000 ininvestment assets. Merrill Edge is thus the repository of those Bank of America clients, many with IRA accounts, with less than $250,000 ininvestment assets.

15. For Merrill Lynch and Bank of America the primary source of profits are fees and commissions.

## IV.    JURISDICTION AND VENUE

16. The claims in this Complaint arise pursuant to ERISA and under that statute a plan participant and accountholder is entitled to bring an action on behalf of the plan to remedy a breach of fiduciary by the fiduciaries to the Plan. 29 U.S.C. 1132(a)(2). The Court has jurisdiction by reason of that statute.

17. Further the tying claims alleged herein are brought under the Sherman Antitrust Act and the provisions of Section 4 of The Clayton Act, 15 U.S.C. Sec. 15, to recover treble damages and costs of suit, including reasonable attorney's fees.

18. Venue is proper in this district as defendant Merrill Lynch had its headquarters in this district, and as a public company was listed on the New York Stock Exchange. Defendant Bank of America Corp. does business in this district and as a public company, is listed on the New York Stock Exchange.

## V.    APPLICABLE LAW

19. This action is brought under The Employment Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001 et seq. and The Sherman Antitrust Act, 15 U.S.C. 1 et seq. ERISA imposes a duty on fiduciaries of an employee benefit plan to administer the plan prudently in the sole interest of participants and beneficiaries. Excessive fees violate ER ISA standards; so do revenue sharing arrangements or kick-backs. The Sherman Antitrust Act prohibits tying arrangements in interstate commerce: a marketing arrangement where a supplier will sell one product or services (here recordkeeping, investment advice, mutual fund selection on the express or implied condition that the buyer (here the plan and plan sponsor) also purchase a different product (here the Collective Trust and mutual funds of Merrill Lynch and the roster of mutual funds paying a revenue share to Merrill Lynch).

20. Claims are also made under the law of the State Of New York including NY GBL Sec. 349 (Act or Practice That Is Misleading In a Material Respect) and Donnelly Act.

### VI.    THE PLANS

21. This Class Action is brought on behalf of the Defined Retirement Contribution Plans of Clifford Chance U.S LLP, which is the sponsor of those plans. There was one plan until 2008, at which time, without notice to the Plan participants, account-holders, and beneficiaries, multiple plans were established.

### VII.    THE CLAIM AND APEAL TO THE TRUSTEES OF THE PLAN

22. Under date of October 4, 2012, Class Plaintiff Walker made claims against the Plan.

23. Failing to conform to the Plan's procedures, the Firm denied the claims one week later, in a one sentence response.

24. In January 2013, Class Plaintiff Walker requested a copy of the Plan and annual filings.

25. In response, the Firm provided those copies, and said it would respond to the Claims made.

26. A formal decision denying the Claims was made by the trustees in March 2013, promising to produce documents if Class Plaintiff Walker chose to appeal within a deadline.

27. Adhering to deadlines, Class Plaintiff filed his 30 page appeal in early May 2003, on behalf of himself and others similarly situated, despite the fact that the trustees had not produced any documents as promised.

28. Pursuant to provisions of the Plan, Class Plaintiff Walker requested but was denied a hearing. He therefore sent to the Trustees the hearing exhibits that would have been introduced by Class Plaintiff.

29. The Plan produced various documents long after they had been requested, but failed to make full production.

30. The Appeal was denied at the end of August, 2013.

31. Under date of September, 2013 Class Plaintiff Walker complained that (a) the Trustees threats were inappropriate retaliation and (b) many issues had not been addressed by the Trustees, but at least the appeal process was over.

32. While Class Plaintiff Walker completed the technical requirements of the Plan, throughout the appeal process the Trustees of the Plan breached their fiduciary duty of fair dealing. In fact, throughout the appeal process the Trustees, Plan Sponsor and their counsel failed to disclose or make a full production of the documents, and the topic related to fee-sharing was not explained or addressed. In fact, Class Plaintiff was required to make his appeal to the Trustees of the Plan, without the benefit of the relevant documents.

### VIII.   THE PETITION TO THE EMPLOYEE BENEFIT SECURITY ADMINISTRATION

33. Class Plaintiff has filed a Petition to the Employee Benefit Security Administration to address the question if he was improperly terminated as a participant in the Plans, as well as other issues presented to the Trustees of the Plan.

34. Class Plaintiff remains an account-holder and beneficiary of the Clifford Chance US LLP Amended & Restated Tax-Deferred Savings and Profit-Sharing Plan I (Employer Plan Number 003).

### IX.   SUMMARY OF THE ACTION

35. This is a Class Action on behalf of the 401(k) Plans and participants and beneficiaries whose Plans were administered by Merrill Lynch as a record-keeper/administrator, investment adviser, plan menu provider, or other fiduciary role and were subjected to (a) excessive fees, (b) higher fee cost "Merrill Lynch Collective Trusts", (c) fee sharing or kickbacks of investment fees paid by participants or account holders to a mutual fund, a significant portion of which were kicked back to the record-keeper and menu provider Merrill Lynch or the plan sponsor. Further, the menu selection provided by Merrill Lynch did not include a complement of low fee funds.

36. As the Department of Labor stated in its Amicus Curiae Brief filed before the U. S. Supreme Court, in the matter *Glenn Tibble, et al. v. Edison International, et. al*. (No. 1.3-550) argued on February 25, 2015: **"The fiduciaries must act 'solely in the interest of the participants and beneficiaries'".**

37. The Clifford Chance US LLP Plans were not run in the sole interest of the participants principally because Merrill Lynch pursued its own profit motives against the participant's and beneficiary's interest.

38. **First:** The Merrill Lynch menu offering did not include any low fee mutual funds. As both the U.S Securities Commission ("SEC") and the U.S. Department of Labor ("DOL") have stressed in bulletins and charts, fees have a substantial impact on a retirement portfolio over time.

39. **Second:** Index funds, registered with the SEC, with low fees have been available for decades; advocated by a respected industry advocate, John Bogle. Merrill Lynch, however, as the Investment Adviser and menu offeror, in the Plans, only included unregistered index collective trusts, a stock index trust and a bond index trust with fees that were 2 to 3 times more expensive.

40. **Third:** Merrill Lynch as the Investment Adviser and menu offeror, populated the Plan with its own funds through 2006 when it exited the fund business. Thereafter, as a 45% owner of Blackrock it included those funds in the menu. These funds had excessive fees.

41. **Fourth:** For their investments in mutual fund offerings, participants paid those mutual funds fees for mutual funds investment acumen to pick a winning portfolio. Without disclosure to the participants and beneficiaries, Merrill Lynch arranged "fee sharing" kickbacks with those mutual fund providers. At a point in time, the firm Clifford Chance US LLP, again without telling the participants and beneficiaries, decided to take a portion of the kickbacks for the firm as sponsor of the Plans.

42. All of the above acts constitute a violation of the fiduciary duties under ERISA owed to the participants and beneficiaries by the defendants.

43. In addition, the provision of Collective Index Trusts was a classic "tied product or service" prohibited by the Sherman Act. As unregistered index funds or trusts, they could not be sold to the public—Merrill Lynch could only unload those index collective trusts tied to its role as record-keeper and investment adviser. Similarly, Merrill Lynch proffered a rooster or slate of mutual funds which were sharing their fees ,taken from participant investments, with Merrill Lynch. This is another "tied product or service" prohibited by the Sherman Act.

## X.      BACKGROUND FACTS

### A. Introduction

44. Mutual Funds allow an investor to buy a fund with a large collection of stock or bond holdings and with an investment manager to select that portfolio. For that investment acumen and stock selection, the investor pays fees which are a percentage of the amount of the investment, applied every year, whether the fund price goes up or down. The fees are also referred to as the "expense ratio"- the percentage of asset claimed annually for investment advice and operating expenses. In addition, the SEC permits a 12-b fee for promotion and other such expenses.

45. The stock market is tracked by averages such as the Dow Jones, the S&P 500, NASDAQ, and other tracking indices. As alleged in more detail below, most investment managers cannot beat, over time, the tracking average that is most applicable to the fund. As a consequence, funds tracking an index were developed first in the 1970's by the head of

Vanguard, John Bogle with the Vanguard 500 Fund. Funds tracking an index, have no need of stock picking or the expense of investment acumen and stock selection. Accordingly, index funds have low expenses.

46. During the time covered by this class action, there have been a bevy of low fee mutual funds. In fact, a whole new industry of Exchange Traded Funds was developed to provide low fee options.

47. As alleged below, Merrill Lynch was more interested in profits, than providing a menu with low fee offerings.

### B. Applicable Fiduciary Standard

48. The analysis of these claims starts with the fiduciary responsibilities that applied to Merrill Lynch.  As part of its investigation into 401K plans and February, 2012 Order, the U.S. Department of Labor issued in February, 2012 a Booklet entitled "**Meeting Your Fiduciary Responsibilities".**  The Booklet was intended to "address(es) the scope of ERISA's protections for private-sector retirement plans.…It provides a simplified explanation of the law and regulations."

49. The Booklet sets forth the following standards that are included in fiduciary responsibilities:

**"WHAT IS THE SIGNIFICANCE OF BEING A FIDUCIARY?**

**Fiduciaries have important responsibilities and are subject to standards of conduct because they act on behalf of participants in a retirement plan and their beneficiaries. These responsibilities include:**

- **Acting solely in the interest of plan participants and their beneficiaries and with the exclusive purpose of providing benefits to them;**
- **Carrying out their duties prudently;**

- **Following the plan documents (unless inconsistent with ERISA);**
- **Diversifying plan investments; and**
- **Paying only reasonable plan expenses.**

**The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments. Lacking that expertise, a fiduciary will want to hire someone with that professional knowledge to carry out the investment and other functions. Prudence focuses on the *process* for making fiduciary decisions. For instance, in hiring and plan service provider, a fiduciary may want to survey a number of potential providers, asking for the same information and providing the same requirements. By doing so, a fiduciary can document the process and make a meaningful comparison and selection.**

***

**Diversification – another key fiduciary duty – helps to minimize the risk of large investment losses to the plan. Fiduciaries will want to document their evaluation and investment decisions."**

### C. History

50. The mutual fund industry has grown substantially over the past thirty-five years. The Employment Retirement Income Security Act ("ERISA") was enacted in 1974 and many companies and organizations changed their pension policies. The primary change was from Defined Benefit Plans to Defined Contribution Plans, and for many organizations the Defined Contribution Plans were 401(k) Plans. The number of mutual funds increased from 1,200 in 1989 to 7,700 in 1999.

51. In 2000, the mutual fund industry accounted for 17% of retirement assets and almost 42% of 401K assets.

52. The Labor Department oversees 483,000 participant-directed individual account plans such as 401(k)-type plans with 72 million participants and over $3 trillion in assets. With the shift in many corporations and businesses to 401(k) plans, investment companies set themselves up as plan advisers. The investment companies acting as plan advisers for

401(k) plans charged a fee for that service and additionally assured that they or other investment companies would receive annual fees from the mutual funds of the Plan menu.

53. The mutual fund companies run a family of funds and all but Vanguard were and are "for profit" companies. David Swenson, who runs Yale's endowment, wrote in 2005, "when fiduciary responsibility to investors competes with corporate desire for profits, profits win."

54. In the mid-seventies, one firm, Vanguard, broke from the pack and introduced index mutual funds with much lower annual fees. For the next 35 years, its leader John Bogle spoke out against the unjustifiably high fees of the majority of funds and the practice of touting the latest hot or well-performing fund when each fund family also included a host of poorly performing funds.

55. In the 1980's and thereafter, there was a focus on load (entry and exit) funds versus no-load funds, both of which charged fees deducted on a monthly or quarterly basis. Load funds were often more in the higher fee grouping. The higher fee grouping have been under criticism for the past two decades. The mutual funds of Merrill Lynch were in that category.

56. Merrill Lynch had a tremendously successful "Cash/Investment Management /Checking/Credit Card" account. Merrill Lynch was also the defendant in the Gartenburg Class Action, where the Court ruled in 1982 that mutual funds and investment advisers could defend their fees by referencing what other mutual funds and investments advisers were charging. As a result, a hugely profitable mutual fund "club", or business, developed.

57. Many funds, however, became no-load funds with no purchase or sales charge.

14

58. In the early 1980's, the Securities and Exchange Commission ("SEC") approved 12b1 fee plans that authorized marketing costs could be deducted from the assets of the fund on the theory that larger funds would dramatically lower their annual fees.

59. During the 1990's, several technical developments affected the mutual fund industry. The digital revolution, computerization and the Internet, as well as Edgar SEC filings, provided for advances and much lower costs for administration, information collection, analysis, and marketing.

60. From the mid-1970's, through the 1990's, the brokerage costs for trading declined dramatically.

61. In the mid-1990's, the first Electronic Trading Funds ("ETFs") were introduced with much lower fees than mutual funds.

62. As of the mid-1990's, several other investment company family funds had broken with the higher fee funds and sold low cost funds and marketed the low cost approach.

63. By 1998, index mutual funds and the first EFTs had demonstrated that a basket diversity type of mutual fund could be achieved with much lower annual fees.

64. Faced with criticism and the competition of index funds, EFTs, and lower cost mutual funds, the mutual fund lobbyist type institute Investment Company Institute,  issued three reports in 1999 on mutual fund costs to argue that total shareholder costs had declined over the period 1980 to 1998.

65. By 1998 there was longstanding criticism of the high level of mutual fund fees and
expenses and the lack of transparency in what mutual fund holders were being charged. By
1998 the U.S. Congress and the SEC had begun to look at the level of fund fees and
expenses as well as the transparency issues and the SEC had commenced a report on fees
and expenses.

66. The level and impact of mutual fund fees was a major concern. In May of 2000 the SEC
described the actions it had taken to require disclosures of fees:

> **"I. <u>Recent Initiatives Relating to Mutual Fund Fees</u>**
> **A. <u>Disclosure and Investor Education Initiatives</u>**
>
> The primary focus of our disclosure effort has been to make fund fees and
> expenses more transparent to investors and to allow investors the ability to compare
> fees and expenses between different funds, as well as to educate investors about the
> importance of fees.
>
> In the 1980s, the Commission became concerned that the increasing
> variety of sales loads and other fund distribution arrangements could, unless
> uniformly presented, confuse investors. For that reason, since 1988, Form N-
> 1A has required every mutual fund prospectus to include a fee table. The fee
> table is a uniform, tabular presentation that shows both charges paid directly
> by a shareholder out of his or her investment, such as front-end and back-
> end sales loads as well as recurring charges deducted from fund assets, such
> as management and rule 12b-1 fees. The fee table is accompanied by a
> numerical example that illustrates the total dollar amounts that an investor
> could expect to pay on a hypothetical investment if he or she received a 5%
> annual return and remained invested in the fund for various time periods.
> The fee table is intended to present fund investors with expense disclosure
> that can be understood easily and that facilitates comparison of expenses
> among funds.
>
> In 1998, the Commission required the fee table to be included in a new
> plain English risk/return summary that appears in the front portion of al
> prospectuses. The risk/return summary functions as a standardized
> "executive summary" of key information about the fund. As part of these
> changes, the Commission increased the investment amount illustrated in the
> fee table example from $1,000 to $10,000 to reflect the size of a more typical
> fund investment and to approximate more closely the amount of fees and
> expenses that a typical investor would expect to incur over time. The
> Commission also improved the method of presentation for several items

**included in the fee table, including temporary expense reimbursements, fee waivers, and certain account fees paid directly by shareholders.**

**\*\*\***

**In January of this year the Commission issued an investor alert that advises mutual fund investors to look at more than past performance, recommending, in particular, that they assess a fund's costs which can have an enormous effect on performance. To assist investors in assessing costs, the Commission posted on its website a Mutual Fund Cost Calculator, an innovative interactive web-based tool that investors can use to calculate the costs of mutual fund ownership. During the first quarter of 2000, the calculator averaged over 8,500 hits per month – making it one of the most frequented portions of the SEC website."**

### The 2000 Arnott, Berkin & Ye Study

67. In the summer of 2000, Arnott, Berkin and Ye published in the Journal of Portfolio Management a study entitled, "How Well Have Taxable Investors Been Served in the 1980's and 1990's". The study showed that during the twenty years covered, the average mutual fund underperformed the market as measured by the Vanguard 500 Index Fund with a fifteen-year deficit of 4.2 percent per annum. The study presaged the SEC'S requirement of having actively managed mutual funds compare their returns to a benchmark. Just as important was the study's finding that the average mutual fund investment manager could not beat the market.

### The June 2000 GAO Report on Mutual Fund Fees

68. In June of 2000 the U.S. General Accounting Office ("GAO") issued its Report, **Mutual Fund Fees: Additional Disclosure Could Encourage Competition**. (GAO/GGD-00-126 Mutual Fund Fees) The lengthy investigation and report resulted in a clear and concise recommendation:

"**Recommendations:**
**To heighten investors' awareness and understanding of the fees they pay on mutual funds, we recommend that the Chairman, SEC, require that the periodic account statements already provided to mutual fund investors include the dollar amount of each investor's share of the operating expense fees deducted from their funds. This disclosure would be in addition to presently required fee disclosures."**

69. The GAO found that higher fees vastly lowered returns over time.

"***Long-Term Impact of Annual Fees on Mutual Fund Investment Returns Can Be Significant***
**The annual fees that investors pay can significantly affect investment returns over the long term. For example, over a 20-year period a $10,000 investment in a fund earning 8 percent annually, and with a 1-percent expense ratio, would be worth $38,122; but with a 2-percent expense ratio it would be worth $31,117.**

**Various studies have also documented the impact of fees on investors' returns by finding that funds with lower fees tended to be among the better performing funds. A March 1998 analysis by an industry research organization examined stock funds across six different investment objectives over a 5-year period and found that lower fee funds outperformed higher fee funds over 1-, 3-, and 5-year periods through November 1997. For example, of the large funds that invest in undervalued securities, the funds in the quartile with the lowest fees, which averaged 78 cents per $100 of assets, had the highest average performance—-returning 138 percent over 5 years. Conversely, the funds in the quartile with the highest fees—averaging $2.26 per $100 of assets—had the lowest performance return over the period, averaging 112 percent."**

70. The SEC sent a letter commenting on the report, defending the current disclosure requirements but did not endorse the GAO recommendation to have the fee deduction set forth on each account statement.

71. The GAO disputed the SEC's Letter of Comment with the following statement:

"**GAO's Comments:**
SEC stated that our report should note that the current disclosure does provide investors with access to information on an annual basis that enables them to assess and understand the fees they bear and to effectively compare fees. We agree that disclosure of such information is currently required, and we have added additional language to our report to clarify that these disclosures are made

annually. However, these disclosures present fund expense ratios as a percentage of fund assets and include an example of the likely amount of expenses to be incurred over various holding periods for a hypothetical $10,000 account. Furthermore, these reports are provided to investors only semiannually. Although investors can use this information to compare among funds, the additional disclosure we recommend is intended to supplement, not replace, the existing disclosures, and should serve to reinforce to investors the fact that they do pay for the services they receive from their mutual funds. The specific dollar amounts we recommend that funds disclose should also have the added immediacy of being unique to each investor and his or her account. By disclosing these additional dollar amounts on investors' quarterly account statements, funds will provide fee disclosures to investors more frequently than they currently do."

72. At the time that it was reviewing the GAO Draft Report in 2000, the SEC modified its website with respect to "Mutual Fund Fees and Expenses" stating, "a frequently asked question is whether the SEC imposes any specific limits on the size of the fees that a fund may charge. The short answer is the SEC does not, although the SEC limits redemption fees to 2% in most situations." Additionally, under a heading "A Word About Mutual Fund Fees and Expenses", it juxtaposed a fund operating fee of 1.5% with one of 0.5% to show the 20-year benefit of over 18% in the corpus of the lower fee fund; and highlighted its web "Mutual Fund Cost Calculator" to "compute how the costs of different mutual funds add up over time and eat into your returns."

### The December 2000 SEC Report on Mutual Fund Fees

73. The SEC was to have the final word, and in December 2000 it issued its report entitled **Division of Investment Management: Report on Mutual Fund Fees and Expenses.** (http://www.sec.gov/news/studies/feestudy.htm) Although the report was exhaustive, in accordance with the mutual fund industry claims, the SEC determined that the GAO's recommendation (that individual account statements reflect the specific deductions from

the corpus mutual fund sub-account) was too expensive a burden. The SEC preferred its

investor education approach and said it would study options:

"**2. Summary of Recommendations**

We believe that the current statutory framework's primary reliance on disclosure and procedural safeguards to determine mutual fund fees and expenses, rather than on fee caps or other regulatory intervention, is sound and operates in the manner contemplated by Congress. We believe, however, that the framework can be enhanced in certain areas. A brief summary of our recommendations follows. These recommendations are more fully discussed in Section IV.

**a. Disclosure and Investor Education**

Many observers give the Commission high marks for requiring funds to disclose information about their fees in a format that is understandable to investors and that facilitates comparison with the fees charged by other funds and other investment alternatives. The Commission should, nevertheless, consider whether requiring the disclosure of additional types of fee information would facilitate investors' awareness of fund fees and investors' ability to understand their effect. For example, the General Accounting Office recommended in its report that the Commission require mutual funds and/or broker-dealers to send fund shareholders account statements that include the dollar amount of the fund's fees that each investor has indirectly paid. The GAO report acknowledges however, that there are advantages and disadvantages to this recommendation and that other alternatives should be considered. We recommend that, because the recommended information could be disclosed in various ways, the Commission should evaluate the most effective way of disclosing fees and expenses that investors incur, taking into account the cost and burden that various alternative means of making such disclosures would entail.

We agree with the General Accounting Office that the fund industry and the Commission should encourage fund shareholders to pay greater attention to fees and expenses. We believe that changes to mutual fund disclosure requirements have generally produced the best results when the changes are designed to meet the information needs of investors and assist them in making better investment decisions. With respect to fund fees and expenses, we believe that investors need information, in addition to information about the dollar amount of fees, that helps them to understand the fees that they pay. Moreover, they need to be able to compare the fees of their fund to the fees of other funds and other types of investments. To satisfy these broader needs, we believe that any additional required fee information, including the dollar amount of fees, should be provided in semi-annual and annual shareholder reports. One advantage of this approach is that it would enable investors to not only compare the fees of funds but also to evaluate the fee information that would be contained in the reports to shareholders alongside other key information about the fund's operating results, including management's discussion of the fund's performance.

The additional information about actual costs could be presented in a variety of ways. One possible way to present the data would be to require shareholder reports to include a table showing the cost in dollars incurred by a shareholder who invested a standardized amount (*e.g.*, $10,000) in the fund, paid the fund's actual expenses, and earned the fund's actual return for the period.  The Commission could require, in addition, that the table include the cost in dollars, based on the fund's actual expenses, of a standardized investment amount (*e.g.*, $10,000) that earned a standardized return (*e.g.*, 5%). Because the only variable for this calculation would be the level of expenses, investors could easily compare funds to one another."

74. The SEC report reviewed the fees under the Heading "Results of Econometric Model of

Expense Ratios" and found for Index funds:

"**d. <u>Index, Institutional, and Multi-Class Funds</u>
In 1999, other things held equal, the operating expense of an index fund was
45 basis points lower than an equivalent fund that was not an index fund.**"

75.  The SEC also referenced the competitive pressure of "**emerging products and services**"

highlighting low-cost exchange traded funds (ETFs) and competitive index funds.

76. The SEC continued to place its reliance on disclosure by investor education and not

changes to individual account statements.

77. The effective ultimate result was the use of a simplified "Summary Prospectus" which

Merrill Lynch failed to deliver to 401(k) account holders. (Significantly, Merrill Lynch

does send the "Summary Prospectus" for funds to its Merrill Edge IRA account holders).

## <u>The 2001 Freeman-Brown Article</u>

78. In 2001, John P. Freeman and Stewart L. Brown published an article entitled "Mutual Fund

Advisory Fees: The Costs of Conflicts of Interest" 26 J. Corp. L. 609. The Freeman-Brown

study made waves and triggered calls for reform and a Congressional investigation. The

Freeman-Brown study showed that the average pension fund paid an investment adviser

half (1/2) the fees compared to what the mutual funds paid for the same investment

advisers.

79. The SEC Chairman at the time was called before Congress:

> "For instance, former SEC Chairman Arthur Levitt testified before a House
> subcommittee and confirmed Freeman-Brown's findings and demanded radical
> reform. He testified: "The largest mutual funds pay money management advisory
> fees that are more than twice those paid by pension funds." Thus, he argued: It is
> essential that investment company boards be required to solicit competitive bids
> from those who wish to undertake the management function. Furthermore, boards
> should justify to their bosses, fund shareholders, why they chose a particular
> investment advisor and each year should demonstrate that they have aggressively
> and competitively negotiated management fees."[1]

80. In March 2003, the General Accounting Office of the U.S. issued a study finding that the

expense ratio of 46 large equity funds had risen nearly 8% between 1998 and 2001.

## The GAO 2003 Report—Mutual Funds: Greater Transparency Needed in Disclosures to Investors

81. In June 2003, pursuant to a congressional request, the GAO issued another report on

Mutual Fund Fees. It said the GAO commenced the investigation for the following reasons:

> "**Why GAO Did This Study:**
>
> **The fees and other costs that investors pay as part of owning mutual fund shares can
> significantly affect their investment returns. As a result, questions have been raised as
> to whether the disclosures of mutual fund fees and other practices are sufficiently
> transparent. GAO reviewed (1) how mutual funds disclose their fees and related
> trading costs and options for improving these disclosures, (2) changes in how mutual
> funds pay for the sale of fund shares and how the changes in these practices are
> affecting investors, and (3) the benefits of and the concerns over mutual funds' use of
> soft dollars."**

82. The GAO concluded in its recommendation:

---

[1] *Mutual Funds: Who's Looking out for Investors?: Hearing Before the Subcomm. on Capital Mkts., Ins. and Gov't Sponsored Enters. of the H. Comm. on Fin. Servs.*, 108th Cong. 48 (2003) (statement of Arthur Levitt, Chairman, Securities Exchange Commission), *available at* http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=108_house_hearings&docid=f:92982.pdf

"*Recommendations*:

**To promote greater investor awareness and competition among mutual funds on the basis of their fees, we recommend that the Chairman, SEC increase the transparency of the fees and practices that relate to mutual funds by:**

- **considering the benefits of additional disclosure relating to mutual fund fees, including requiring more information in mutual fund account statements about the fees investors pay."**

83. As quoted in Forbes Magazine (Dec. 22, 2003), John Bogle estimated that mutual fund investors pay $70 billion per year in fee expenses. He estimated only $4 billion goes to investment management with $16 billion going to marketing, resulting in pretax profit margins estimated at over 50%.

## 2003: The Federal Thrift Savings Plan Had the Participants' Assets Primarily in Index Funds

84. As publicly reported, and as summarized in David Swenson's book, referenced below:

**"The U.S. government's Thrift Savings Plan, developed for the country's civilian and military employees, serves as a possible model. At the end of 2003, the plan contained $128.8 billion in assets distributed across five funds. Four of the funds track well-known indices, namely the large-capitalization-stock S&P 500 Index, the small-capitalization-stock Wilshire 4500 Index, the developed-foreign-stock MSCI EAFE Index and the broadly inclusive domestic bond Lehman Brothers U.S. Aggregate Index. From a security selection perspective, the U.S. government protects its employees from playing the negative-sum game of active management."**

85. The index fund that mirrored the Standard & Poor's 500 Index had fee expenses of 7 Basis Points.

## 2003 Vanguard Funds Provided Substantial Cost Savings

86.  As referenced in David Swenson's book, following the sentence "**Lower fees produce a quantifiable advantage for investors,**" Swenson set forth a table:

| Table 8.3: Vanguard Funds Provide Substantial Cost Savings<br>*2003 Total Expense Ratios (Percent of Assets)* | | | |
|---|---|---|---|
| | **General Equity** | **World Equity** | **Taxable Fixed Income** | **Money Market** |
| Lipper | 0.91 | 1.15 | 0.75 | 0.60 |
| | **Total Stock Market** | **Total International Stock Market** | **Total Bond Market** | **Prime Money Market** |
| Vanguard Investor Shares | 0.20 | 0.36 | 0.22 | 0.32 |
| | **Total Stock Market** | **Total International Stock Market** | **Total Bond Market** | **Prime Money Market** |
| Vanguard Admiral Shares | 0.15 | 0.36 | 0.15 | 0.14 |

*Source: Lipper, Inc. "Global Themes in the Mutual Fund Industry—2003"; Vanguard. Note: 2003 data reflect updates received after the publication of the initial report.*

## The Mutual Fund Late Trading Scandal

87. In the summer of 2004, the Attorney General of New York commenced an investigation regarding a 401(k) which resulted from a tip about late trading that some mutual funds allowed to large and knowledgeable customers. This tip allowed those customers to make trades and profits illegally. Other State Attorneys General and the SEC commenced investigations. In the course of these investigations, the profits that the mutual funds were wringing from fund investors were investigated.

88. In early November 2003, the Attorney General of New York testified before a Congressional committee on the trading abuses and the enormous fees paid by fund shareholders to the investment companies and the disparity in the lower fees charged to institutional shareholders from the higher fees charged to individual shareholders.

89. The Investment Company Institute ("ICI") a powerful trade association for its mutual fund members, sprang into action. The members not subject to investigation sought to distance themselves from the members charged. For instance, the American Century investment

company began its "Bill is our President" ads: "he stresses the importance of integrity and

money management. He knows that we succeed only by making others successful. Can

strong values contribute to strong results? Just look at the number." Four funds were

featured, not including its largest fund and not including the Giftrust fund whose

shareholders were sent a January 2004 letter that stated "in recognition of Giftrust's

underperformance…, the fund's Board of Directors has asked American Century's

investment manager, American Century Investment Management, Inc., to waive Giftrust's

entire 1% management fee for a six-month period."

90. However, on behalf of its investment company members the ICI continued on its 4-year

defense of the fee levels imposed by over 95% of its members. The ICI's president

countered the attack on the fees by stating that the institutional investors pay fees for

advisory services whereas the individual shareholders have to additionally pay for the

marketing and administrative fees. It tried to turn the debate away from the level of fees to

one of disclosure in the annual reports—a tactic that had worked once before with the

Securities and Exchange Commission.

91. In addition, the ICI proposed an industry-wide minimum two percent redemption fee on the

sale of virtually all mutual funds for a minimum of five days following purchases.

92. Once the ICI had proposed the 2% early redemption penalty fee in November of 2003, a

number of its members instituted it and extended the holding period requirements.

93. In a report in the New York Times, January 2, 2004, the Securities and Exchange

Commission Chairman was quoted as stating the Commission's longstanding position: "we

are not in the fee-setting business," Mr. Donaldson said. "what we believe in is greater transparency."

94. Notwithstanding the SEC's Chairman's reiteration that it was not in the fee-setting business, the ICI sent an Open Letter to the U.S. Congress on January 28, 2004 calling for a mandatory 2% redemption fee on most short term trades to "combat trading abuses". In doing so it stated that mutual funds were where more than 50 percent of middle-income American invest—92 million Americans—and claimed to be putting "investors first".

95. In addition, in February 2004 the ICI released a report entitled "The Cost of Buying and Owning Mutual Funds." They issued a press release on February 18: "ICI Economist Reports that 'Total Shareholder Cost' of Investing in Stock Mutual Funds Has Declined 45 Percent Since 1980," and revised its website to answer the question: "Are Fund Fees Too High?"

### February 2004: Money Magazine Names Vanguard Total Stock Market Index Fund as a Best Fund

96. In its February 2004 publication, Money devoted the issue to "Funds 2004". In the article "The Best Funds for 2004," the magazine included the Vanguard Total Stock Market Index and the Vanguard Total Bond Market Index as two of the eight funds named.

97. In its press release of February 18, 2004, the Investment Company Institute (" ICI") Deputy Chief Economist reported his finding that "60 percent of shareholder assets are invested in funds with total expenses under 1.00 percent." This finding clearly showed that investors themselves were unwilling to pay supra-competitive fees.

99. The President of Ariel Capital Management, referred to by ICI as an industry leader, was the investment company advisor to the Ariel Mutual Funds, a small mutual fund company with $5.5 billion in assets invested for 280,000 investors.  On February 26, 2004, the President of Ariel Capital Management gave testimony before Congress citing ICI reports and supporting mutual fund fees. The testimony evidences the pervasive degree of the agreement of the ICI members on the mutual fund fee structure and level of fees.

100. The annual fees collected from mutual fund investors by the investment companies, which are member of ICI, are over $70 billion per year.

101. The regulatory and SEC prosecutions of numerous investment companies resulted in resolutions from a number of these investment companies to reduce fees. Some examples are the following:

   (a) Putnam settled the SEC Complaint on Market Timing for $110 million, a portion of which was to be returned to investors. It agreed to cut holder fees by $35 million a year. At about that time, Putnam disclosed that the fund managers involved in the trading scandal were paid what the SEC called "lavish compensation"—the excessive sums of $14.3 million and $8.7 million a year in 2000. Putnam's President was paid $35 million.
   (b) Alliance Capital Management agreed to pay a fine of $250 million and agreed to make management fee reductions of 20% for the next five years, estimated at $350 million.
   (c) As part of its settlement agreement, MFS paid a fine of $225 million and agreed to fee reductions of $25 million a year for five years from its annual fees received of about $600-700 million.
   (d) In a settlement announced on April 28, 2004, Janus Capital Group agreed to pay fines of $101.2 million and also agreed, pursuant to the demand of the Attorney General of New York, to reduce its fees by $125 million over the next five years.
   (e) In a settlement agreement announced on May 21, 2004, Strong Financial Corporation agreed to pay $80 million on top of the $60 million to be paid by its former chairman and also agreed, pursuant to the demand of the Attorney General of New York, to reduce its fees by at least $35 million over five years, which amounts to a reduction of approximately 6% per year.
   (f) In a settlement agreement announced on June 21, 2004, Pilgrim Baxter & Associates, Ltd. agreed to disgorge $40 million to mutual fund investors and pay $50 million in civil penalties and also agreed, pursuant to the demand of the Attorney General of

New York, to reduce management fees by 3.16 percent over a five-year period, a reduction valued at $10 million.

102. While the trading abuse problem and fines levied for those violations was within the province of the SEC, the fee reductions garnered principally as a result of the demands of Elliot Spitzer, Attorney General of New York backed up the New York Attorney General's charge that fees were too high and that the differential of what the public paid and what the institutions paid was not justified. The fee reductions agreed to by these large investment companies constituted specific admissions by those fund families that fees were supra-competitive and could be reduced.

103. Regarding the settlement with Janus Capital Group, the New York Times reported, "Mr. Spitzer said in an interview that his office sought the fee reduction because of the gap between what Janus charged individual investors and the management fee paid by large institutions like pension funds. Pension funds generally pay a lot less in money management fees than small investors do, a disparity Mr. Spitzer has repeatedly said is unfair. "What we've set off here is the competitive pressure that will drive fees to the point that a properly functioning market would arrive at," Mr. Spitzer said.

### The 2005 Swensen Book

104. In March 2005, David F. Swensen, the Chief Investment Officer of Yale University's Endowment, published a book entitled "Unconventional Success", a critical indictment of actively managed mutual funds. In a detailed analysis he pointed out the evidence that for-profit, actively managed funds consistently failed investors. He pointed out that excessive management fees, churning of portfolios, and pursuit of profits harmed account holders.

28

105. He also dispelled the notion that in active management investment managers, "you get

what you pay for":

> **"The old adage that 'you get what you pay for' fails to apply to the mutual
> fund world. According to a study conducted by Standard & Poor's, funds
> that charge lower fees consistently produce higher performance. In an
> examination of more than 17,000 funds in the firm's database, researchers
> divided three size classifications of equity funds (small-cap, mid-cap and
> large-cap) and three style classifications of equity funds (value, blend, and
> growth) into above-median-fee and below-median-fee groups, producing a
> matrix of eighteen categories. In eight of nine domestic-equity size and style
> categories, low-fee funds beat high-fee funds by material margins, ranging
> from ten-year annual advantages of 0.8 percent to 3.8 percent. Only in the
> case of mid-cap blend funds did high-fee management match low-fee
> management. The S&P data demonstrate a powerful relationship between
> lower fees and higher performance."**

106. As one cause of excessive fees, Swensen pointed to trading costs due to heavy turnover in

actively managed mutual fund portfolios.

> **"Aronson's trading cost estimates apply to a distressingly large part of the
> mutual fund industry. Lipper data indicate that in 2002, 38 percent of equity
> funds demonstrated turnover in excess of 100 percent. For nearly two-fifths
> of mutual fund capital, Aronson's once-a-year portfolio churn represents a
> best case scenario."**

107. The massive turnover in actively managed mutual funds demonstrates that a holder of

those funds never knows precisely what the stocks and financial instruments being held by

the mutual fund at any given time except the quarterly filings.

108. Finally, Swensen devoted a chapter to "chasing performance," which includes the

technique of looking at past performance such as the Morningstar's Rating system and

focusing on past performance to predict future performance.

### Combination of ML Investment Management with BlackRock/Merrill Lynch Registered Investment Company Funds Rebranded as BlackRock Fund

109. In February 2006, ML Investment Management was combined into BlackRock Inc., with Merrill retaining a nearly 50% interest. The Merrill Lynch registered Funds were rebranded "BlackRock," but often kept the same trading symbol.

110. During the mid-2000's, a number of mutual fund families reduced the fees being charged to compete with the offerings of ETF's and Vanguard. These mutual fund companies included Fidelity and Charles Schwab, which reduced the fees on a significant number of funds to 10 basis points.

### The Department of Labor Begins Its Investigation of 401(k) Plans

111. In 2007, the Department of Labor began its investigation of practices and disclosures in 401(k) Plans. Strikingly, 2007 is the first time that Merrill Lynch decided to disclose gross fee expenses to participants and beneficiaries in the December year-end report.

112. By law, plan sponsors had a "responsibility to ensure that the services provided to their plan are necessary and reasonable." Fees are one factor, along with "the characteristics of the investment options chosen."

### The 2008 Freeman, Brown & Pomerantz Article

113. In 2008, Freeman and Brown, joined by Pomerantz, were back with an article and detailed study entitled "Mutual Fund Advisory Fees: New Evidence and a Fair Fiduciary Duty Test." As set forth above, Freeman and Brown had earlier focused on the fact that pension

plans paid much less in fees for the same investment management advice than mutual funds

paid. In the new article, the authors set forth the record that Vanguard had paid for

investment managers and showed that those fees were significantly lower than those

charged by the same investment managers to others. The article made it clear that almost

all actively managed funds were passing along excessive fees to be deducted from the

investors' accounts:

> "*Conclusion*
> **Over the past several years, there has been much discussion of whether fees for mutual fund portfolio advisory services are too high. In 2001, Freeman-Brown showed these fees were bloated by comparing mutual fund fees to fees charged pension funds for the same services. That comparison, which clearly touched a nerve within the fund industry, showed fund shareholders would save billions annually if fund portfolio management fees approximated those charged by managers of public pension funds' equity portfolios. In Part III, we revisit that inquiry and ultimately reach the same conclusion, this time by evaluating new data drawn from actual mutual fund advisory fee contracts entered into by the Vanguard Group and comparing that data to the fees the same fund advisers charge their own captive funds. This new data is powerful and robust, and it only confirms what has long been clear: Fee gouging is pervasive within the fund industry."**

## Bank of America Buys Merrill Lynch

114. On September 14, 2008, Bank of America agreed to buy Merrill Lynch in an all-stock

deal worth over $50 billion, taking over the world's largest retail brokerage. Merrill Lynch

was in serious financial trouble, overloaded with toxic debt, much of it mortgage related.

The acquisition has been a challenge for Bank of America.

## BlackRock's Purchase of I Shares

115. In June 2009, BlackRock, Inc. purchased the ETF I Shares offerings from Barclays for

$13.5 billion. Bloomberg's reported the deal as follows:

> "The purchase, the biggest of a fund manager, creates a company overseeing $2.7 trillion in assets, more than the Federal Reserve. BlackRock will add about $1 trillion in investments that track market indexes, which are attracting clients at the expense of

funds whose managers choose securities to buy and sell. It's the first top-ranked firm to attempt to combine both types of businesses.

'This will bring the greatest sweep of products to our clients,' Fink, BlackRock's chairman and chief executive.' officer, said in a telephone interview. 'This transaction is transformational.'"

116. BlackRock's acquisition made it clear that index investment was a most necessary and prudent choice and has been the case for over two decades.

## DOL's 2010 Regulation

117. The Department of Labor released a regulation in October 2010 that required plans to give to participant, key information about the plan's investments and fees when they become eligible for the plan and annually thereafter. The DOL wanted to ensure that 401(k) participants have the information they need to make decisions about whether to participate in the plan and how to allocate their account among the investments available.

## DOL's 2012 Final Regulation

118. In February 2012, the Department of Labor published its final regulation on 401(k):

> "**Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans**
>
> *The Department of Labor's Employee Benefits Security Administration (EBSA) released a final rule that will help America's workers manage and invest the money they contribute to their 401(k)-type pension plans. The rule will ensure: that workers in this type of plan are given, or have access to, the information they need to make informed decisions, including information about fees and expenses; the delivery of investment-related information in a format that enables workers to meaningfully compare the investment options under their pension plans; that plan fiduciaries use standard methodologies when calculating and disclosing expense and return information so as to achieve uniformity across the spectrum of investments that exist among and within plans, thus facilitating "apples-to-apples" comparisons among their plan's investment options; and a new level of fee and expense transparency.*
>
> ***
>
> Overview of Final Rule

- The final rule provides that the investment of plan assets is a fiduciary act governed by the fiduciary standards in ERISA section 404(a)(1)(A) and (B), which require plan fiduciaries to act prudently and solely in the interest of the plan's participants and beneficiaries.
- The final rule also provides that when a plan allocates investment responsibilities to participants or beneficiaries, the plan administrator must take steps to ensure that such participants and beneficiaries, on a regular and periodic basis, are made aware of their rights and responsibilities with respect to the investment of assets held in, or contributed to, their accounts and are provided sufficient information regarding the plan and the plan's investment options, including fee and expense information, to make informed decisions with regard to the management of their individual accounts.
- A plan administrator must provide to each participant or beneficiary certain plan-related information and certain investment-related information. These categories of information are described below."

### **Changes to the Plan Menu after the DOL's Final Rule**

119. In March 2012, Merrill Lynch, a unit of Bank of America, discontinued the unregistered Collective Equity Index Trust and unregistered Collective Preservation Trust.

120. The Plan Trustees and Plan Sponsor had the funds in the Equity Index for each account transferred to the registered Vanguard Total Market Index, resulting in a drop in fees from 20 basis points to 6 basis points. This very change was something that was prudent to have been done at the start of the class period. It was dictated by the fiduciary duty that applied.

### **The Demos.org Study of 401(k) Excessive Costs**

121. On May 28, 2012, Demos.org published a Study by economist Robert Hiltonsmith entitled "The Retirement Savings Drain: The Hidden & Excessive Costs of 401(k)'s." It found that even with an actively managed mutual fund that matched the average return of the overall stock market, fees eat up over a third of the total returns earned by mutual funds. Over the

course of a lifetime, a higher income dual household could pay as much as $277,969 in fees.

122. Mr. Hiltonsmith also appeared on PBS's Frontline on April 23, 2013 in its show "The Retirement Gamble".  In addition John Bogle of Vanguard appeared to describe the terrible "tyranny of compound excess expense fees".

### Other Public Notice of the Excessive Fees

123. In the May 2013 issue of *Money Magazine*, a money manager and author of the classic investing book *Winning the Loser's Game,* Charley Ellis, was interviewed in an article entitled, "How Much Does Your Mutual Fund Manager Cost You? Wall Street Veteran Charles Ellis Says it's a Lot More Than You Think." The interview includes the following quote:

> "MONEY*: You've said that people should think differently about fund costs.*
>
> ELLIS: We've been describing fees in a way that really is nonsense. We ought to look at fees not in terms of assets, but as a percentage of the incremental returns of a fund—how much extra return you can expect over a comparable index fund. Think of the 7% expected long-term returns of stocks. A 1.5% fund expense ratio is a big fraction of that 7%. Now compare that with an index's expected returns. How much more can you expect from an actively managed fund? Your fee wipes out any advantage—assuming you get those extra returns. Fees as a percentage of incremental returns are unbelievable."

124. Earlier articles in 2012 had appeared in Fortune Magazine and many other print articles.

125. In addition, both E*TRADE ("Baby" ads) and TD Ameritrade ran television ads referencing the excessive fees being charged in 401(k) accounts. Yahoo Finance also ran a video of the corrosive effect of excessive fees. Finally, the DOL website includes a video of the importance of fees over the long term on the account value.

126. In August 2013, EBSA, DOL published, "A Look at 401(k) Plan Fees 1-2

   http:dol.gov/ebsa/pdf/401k fees, which pointed out:

> **A key concern of investors in retirement plans is the erosion of their long-term earnings by fees. Even a small difference in fees can make a significant difference in the value of an individual account over time.**

127. On October 8, 2013 the Trustee's sent further argumentation, for the first time

   providing a contorted explanation of why petitioner had been terminated as a

   participant in the Plan and declined to respond to Class Plaintiffs continuing inquiry

   about the "fee sharing" that had occured.

128. In February, 2014, the U.S. SEC issued an Investor Bulletin entitled "How Fees and

   Expenses Affect Your Investment Portfolio" showing the difference of a .25% annual

   fee versus .50%   and 1.00% on a portfolio of $100,000 over 20 years. A $40, 000

   difference and increased account value was shown between the .25% and 1.00% annual

   fees. On a $ 100 million Plan, such as the Firm's, that would result in damages of up to

   $40 million over 20 years depending on the average level of fees.

129. In March, 2014, the United States Court of Appeals for the Eighth Circuit issued its

   opinion in *Tussey v. ABB et al*. The Secretary of the United States Department of Labor was

   Amicus Curiae and had filed an amic1.1s brief on June 18, 2013. To be clear, the DOJ had

   announced its position during the time of this Class Plaintiff's appeal of the Trustees'

   ruling denying his claim. The Eighth Circuit ruled that the recordkeeping fiduciary

   obligations were beached by fee-sharing  arrangements:

> **"The facts of this case, unlike the cited cases, involve significant allegations of wrongdoing, including allegations that ABB used revenue sharing to benefit ABB and Fidelity at the Plan's expense. [As, was the case in the present matter]... The district court found, as a matter of fact, that the ABB fiduciaries failed to (1) calculate the amount the Plan was paying Fidelity for record keeping through revenue sharing, (2)**

> **determine whether Fidelity's pricing was competitive, (3)adequately leverage the Plan's size to reduce fees, and (4) "make a good faith effort to prevent the subsidization of administrative costs of ABB corporate services" with Plan assets, even after the ABB's own outside consultant notified ABB the Pan was overpaying for recordkeeping and might be subsidizing ABB's other corporate services."**

130. In making its ruling, the Eighth Circuit affirmed the U. S. District Court's ruling and the

position of the DOL in its Amicus Brief, which stressed:

> **"While the Department's regulations addressing revenue sharing disclosure were promulgated in 2012, all ERISA fiduciaries, including the ABB Defendants, were subject to ERISA's duty of prudence, loyalty, and adherence to plan documents at all relevant times <u>prior to 2012</u>, including the duty to avoid paying service providers excessive fees."**

The significance of the ruling is clear: Merrill Lynch extracted excessive fees for

its recordkeeping and investment adviser roles.

131. In June 2014, the Trustees announced another change to the offerings of the Plan

affecting petitioner's portfolio. Once again, they failed to select a low fee mutual

fund offering. In short, over the course of a dozen years, 90% of Class Plaintiff's

mutual fund holdings were terminated as a Plan offering, for under-performance.

In numerous instances, the replacement offering was later terminated for similar

under-performance.

132. On July 20, 2014 the New York Times published an article by Jeff Sommer, entitled

"**Who Routinely Trounces the Market? Try 2 Out of 2,862**" with a headline "In a

five year study of funds, consistent outperformance was remarkably rare." Jeff

Sommer followed-up the study in an article in the New York Times on March 15, 2015

with the headline "**How Many Mutual Funds Routinely Rout the Market? Zero**".

The article contained the following paragraph:

> **"The data in the study didn't prove that mutual fund managers lacked talent or that you couldn't beat the market. But, as Keith Loggie, the senior director of global research and design at S &P Dow Jones Indices, said in an interview last week, the evidence Certainly didn't bolster the case for investing with active fund Managers."**

133. In August 2014 the Public Broadcasting Station (PBS)'s *Frontline* program re-broadcast a program on the unfavorable impact of high fees on 401K plans. PBS.org/*Frontline*/"The Retirement Gamble", which had originally aired on April 23, 2013, and was one of the sources of Petitioner's appeals brief. That program pointed out that participants in 401K plans, America's principal retirement savings plan, are prisoners to offerings with investment options with high fees.

134. On September 6, 2014 the New York Post published an article entitled "Americans will pay $155,000 in 'useless fees' in a lifetime: analysis." Those fees included 401K fees:

> **"Saving for your future is essential, but many investments in 401(k) and brokerage accounts are loaded with fees," according to FeeX.com officials in a statement. "These fees, which can take $600 billion out of our collective pockets each year."**
>
> **However, officials of the mutual fund and banking industries say consumers receive many services, and they claim fees have been declining the last few years.**
>
> **"The average expenses paid by mutual fund shareholders for actively managed equity funds and index equity funds have been trending down for more than a decade," said Rachel McTague, a spokeswoman for the Investment Company Institute, fund's industry's primary trade group.**
>
> **Still, critics of the mutual fund industry, such as John Bogle, founder of the Vanguard Funds, say industry figures are wrong. Bogle insists they don't take into account that mutual fund industry assets have exploded over the last 20 years. When weighted by asset growth, Bogle writes in his book, *Don't Count on It*, "costs have soared."**

135. On October 2, 2014, The U.S. Supreme Court granted certiorari in *Tibble v. Edison International, et al.* (No. 13-550); limited to the following question: "Whether a claim that ERISA plan fiduciaries breached their duty of prudence by offering higher-cost retail-class mutual funds to plan participants, even though identical lower-cost institution-class mutual funds were available, is barred by 29 U.S.C. 1113(1) when fiduciaries initially chose the higher-cost mutual funds as plan investments more than six years before the Claim was filed."

136. On November 8, 2014 the New York Times published an article by Jon F. Wasik entitled "Finding and Battling Hidden Costs of 401(k) Plans" profiling Mr. Ronald Tussey's litigation against ABB and Fidelity. One of the concluding paragraphs stated:

> **"As Mr. Tussey knows, it may be a long, rocky road through the court system, at the end of which you may not reap a penny".**

137. The "rocky road" of litigation hit another bump on November 10, 2014, when the U.S. Supreme Court denied Mr. Tussey's petition for certiorari, on the issues he had not succeeded on in the proceedings below.

138. However, on November 4, 2014, MassMutual agreed to settle a revenue sharing lawsuit, after it had been found to be a functional fiduciary by the U.S. District Court for the District of Massachusetts. The 401(k) plan sponsor alleged that MassMutual had breached its ERISA fiduciary duties when it received certain revenue sharing payments alleging these payments were kickbacks prohibited by ERISA. This settlement was consonant with both the DOL's amicus brief and the ruling in the Tussey case discussed above.

139. On December 9, 2014 the DOL filed an Amicus Curiae Brief, in the U.S. Supreme Court, in the *Tibble v. Edison International, et. al.* case in support of the Petitioner

stressing that ERISA fiduciaries have an ongoing duty to review plan investments and divest investments that are imprudent and the petitioners' claim was timely. The DOL Brief further sets out the fiduciary duties Linder ERISA which set the standard for the review that should be conducted here. The Tibble case was argued before the U. S. Supreme Court on February 24, 2015.

140. During the week of February 9, 2015 Blackrock (in which Merrill Lynch has an ownership interest) advertised in the NY Times, under a photo representing an investor:

> **"I want an investment plan focused on my needs, not on fees"...Strengthen Your Portfolio With I Share Core Funds--Low cost: 1/10th the cost of a typical mutual   fund..."**

141. On February 21 2015, Lockheed Martin Corp., after 8 years of litigation, on the eve of trial, agreed, a $1.3 billion lawsuit for excessive fees in the workers' 401(k) plans (*Abbott v. Lockheed Martin Corp*., USDC, SD Ill. 06cv00701) by paying $62 million.

142. In addition to the $62 million dollar settlement payment, the settlement agreement provided that Lockheed Martin would (a) have a monthly evaluation of the plan (b) would offer low fee cost funds to participants and (c) would solicit bids from at least three outside firms that have experience handling the administrative/ recordkeeping aspects of large company retirement plans.

143. On February 23, 2015, the President of the United States announced that he would ask the DOL to tighten the regulations on investment professionals who handle retirement savings accounts, particularly the "fiduciary duty" requirements.

144. On March 1, 2015, the New York Times Op Ed column published an editorial entitled "**Protecting Fragile Nest Eggs**":

> **"A new study by the White House Council of Economic Advisers has found that financial advisers seeking higher fees and commissions drain $17 billion a year from retirement accounts by steering savers into high-cost products and strategies rather than comparable lower-cost ones."**

145. On March 4, 2015, a lead story in the Business Day section of the New York Times with headline, "One Change Could Help Americans Save For Retirement," appeared, quoting John C. Bogle of Vanguard and David Swensen of Yale, stressing that low fees are the key:

> **"'Wall Street makes no money on low-cost index funds,' says David S., Swensen who runs the investment portfolio for Yale. 'That is the problem.'"**

146. In short, the markets, the Court, the DOL/EBSA regulations and Court filings, the Press, and the President of the United States have made it clear (a) that a stringent fiduciary duty applies, (b) excessive fees should not be permitted and (c) low fee cost funds should be offered.

## Merrill Lynch's Actions

147. During the entire time this overwhelming clarion of the need to focus on low fees from 1991 to the present, Merrill Lynch, with fiduciary roles as investment advisor, recordkeeper/administrator, and menu provider pursued its own interest over that of the Plans or participants.

148. Merrill Lynch provided a Roster or Slate of mutual funds with high fees, which was populated by mutual funds that had agreed or would agree to "share" or "kickback" a portion of fees that it would receive for 401(k) and IRA investments.

149. The Plan's Trustees or Investment Advisor would select from this Roster or Slate the mutual funds that would be placed in the Plan's Menu.

150. The only index funds in the Roster or Slate were the unregistered Merrill Lynch Equity Index Collective Trust and the unregistered Merrill Lynch Preservation Collective Trust.

151. When it acted as Investment Advisor it populated the Plan menu with Merrill Lynch, and later Blackrock mutual funds.

152. Merrill Lynch would then run the "fee sharing" arrangement. As one document has shown, on a $137 million plan where the participants paid fees of $852,000, $258,000 of that amount would be "shared" or "kicked back" to Merrill Lynch. In the example given, Merrill Lynch then would divvy up the $268,000 with the Plan Sponsor.

153. These procedures were used with hundreds or thousands of the 401(k) plans out of the total of approximately 39,000 retirement plans run by Merrill Lynch.

## V. CLASS ALLEGATIONS

154. A class action is warranted for the claims herein, as the number of plans and participants and beneficiaries affected is large.

155. In Merrill Lynch's Annual Report for 2002 those numbers is shown:

> **Similarly, the retirement sector represents an important opportunity. Today Merrill Lynch serves more than 21,000 workplace-based retirement programs, and more than five million individuals with retirement accounts. A leading industry survey now ranks Merrill Lynch as one of the top-quality 401k providers.**

156. In Merrill Lynch's 2007 Annual Report additional growth in those numbers is shown:

> **Retirement Services**
> **The Merrill Lynch Retirement Group is responsible for approximately $442 Billion in retirement assets for 6.5 million individuals. This group provides a wide variety of investment and custodial services to individuals in the United States through Individual Retirement Accounts ("IRAs") or through one of approximately 39,000 workplace-based retirement programs serviced by the group. We also provide investment, administration, communications and consulting services to corporations and their employees for their retirement programs. These programs include equity award and executive services, 401(k), pension, profit-sharing and non-qualified deferred compensation plans, as well as other retirement benefit plans.**

157. The allegations of this class complaint apply to most of these define contribution plans, 401(k) plans or IRA's. **First,** the Merrill Lynch Collective Trusts in the Clifford Chance

plan were just one in a series of the same type of collective trusts Merrill Lynch placed in the menu of many defined contribution and 401(k) plans. **Second,** Merrill Lynch placed many of its own funds (both Merrill Lynch and then Blackrock) in the menus of those same funds. **Third**, Merrill Lynch engaged in fee sharing arrangements with many of the funds that were placed in those plans.

158. As a result those plans, participants and beneficiaries, were damaged by the excessive amounts taken from the plan and accounts, for excessive amounts paid for fees paid to the funds and for excessive fees paid to Merrill Lynch for services.

159. Common questions of law and fact predominate and include whether defendants: (i) violated the fiduciary requirements of ERISA with excessive fees paid to funds in the menu and for Merrill Lynch's services; (ii) omitted and/or misrepresented material facts to the plans or participants regarding fee sharing arrangements and (iii) violated the Sherman Act by tying (a) the unregistered Collective Trusts and (b) the Roster or Slate of available mutual funds to those that would share the fees deducted from participants' accounts,  to the Merrill Lynch Record Keeping, Custodian, or Investment Advice Services.

160. Class Plaintiff's claims as a representative of the Plan and participants are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications and constitute judicial waste. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

161. Accordingly, this Class Action is brought for the defined contribution plans, 401k plans, and IRAs and their participants and beneficiaries that were damaged by the wrongful actions of Merrill Lynch in the claims made herein.

## COUNT I

### Violation of ERISA, 29 U.S.C. 1001 et. Seq.

162. Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1- 161.

163. During the Class Period, defendants violated the duty on fiduciaries of an employee

benefit plan to administer the plan prudently. 29 U.S.C. 1104 (a).

164. Each of the actions alleged below constitute a violation of that duty;  defendants' were not

operating the Plan prudently for the exclusive benefit of the participants and beneficiaries

and were engaging in undisclosed inappropriate transactions with material omissions and

misrepresentation of fact.

### A. The Plan Menu and Holdings Were Not Diversified, Having Only One Index Offering--A Merrill Lynch Unregistered Collective Trust With Excessive Fees--and Also Providing Kickback of Fees Paid by Accountholders

165. For the entire two decade period, the Plan had only one index offering- the  Trustees,

Investment Adviser and Custodian were completely committed to actively managed

funds with higher fees. Until 2012, the sole index offering was a Merrill Lynch

Unregistered Collective Trust. It made no filings with the SEC and it could not be sold

to the public absent placement with the approval of plan trustees.

166. The Collective Trust's  investment  strategy  was to seek  to provide investment  results

that,  before  expenses,  correspond generally to the price and yield  performance of the

S&P 500  Index. The fees charged to the Plan accountholders  of this index offering

were  30 to 60 basis points- a fee charge that was  more than comparable S&P 500 Index

Funds, by a factor  of 3-5 times. For the entire period the Vanguard 500 Fund and the

SPDR S & P 500 ETF Trust,  public, registered funds, and trusts were available with much

lower fees.

167. In addition, the Collective Trust was just one of series of this type of Merrill Lynch Trusts, and for most of the period had higher fees than other such trusts. Moreover it was a Plan offering that kicked back a portion of the fees.

168. In early 2012 Merrill Lynch decided to eliminate their proprietary Collective Trust Funds from the Plan, which served as the Plan's sole index fund offering, by March 16, 2012. At which time, Merrill planned to liquidate the Trusts. The Trustees had to make a decision on replacement by February 3, 2012.

169. The Plan's Investment Advisor at that time, CSIG, recommended replacing the Merrill Equity Index Trust with the Vanguard Total Stock Market Index. It specified as one of the "key drivers" of this recommendation:

> **Vanguard's expertise and proven ability in indexing**: Vanguard has dedicated significant resources to developing world-class expertise in indexing, which is evident in their consistently low tracking record.

> **Low Cost**: We believe that Clifford Chance should adopt "the **best practice**" of offering the lowest cost alternative "**in the index space.**"…"Given the new pricing arrangement, the Plan can move forward "**with a fund that does not share any   revenue**."

170. The recommendation was an **express admission** that the previous menu offering of the Merrill Lynch Equity Index Trust for all of those years was not in the best interest of the account holders. Merrill Lynch violated its fiduciary duty over 20 years by using an inappropriate bias in favor of its own collective trust and one that engaged in kickbacks, as alleged below.

171. On March 16, 2012, the Plan and Merrill Lynch made the change, and the Merrill Lynch Equity Index Trust holdings (about $12.8 million across all Clifford Chance plans) were transferred to the Vanguard Total Stock Market Index.

44

172. Similarly, the Merrill Lynch unregistered preservation trust had fees that were above the norm. These trusts were also liquidated.

173. The entire series of Merrill Lynch unregistered collective trusts were liquidated in March 2012.

**B. The Trustees Failed to Act in the Sole Interest of the Participants/Accountholders by Offering a Menu of Funds with Only One Low Fee Option**

174. Low fee funds should be present in every 401K Plan; index funds provide the lowest fees. During the 1991-2013 period addressed, the public markets demanded an alternative to mutual funds because of their fee costs and inability to beat their market index results. As a result financial firms and mutual fund families, marketed index funds and a whole new basket of offerings were developed with Exchange Traded Funds ("EFT"s). These index funds and EFT's covered a wide variety of areas-small companies, middle market companies, and foreign companies by region and in groups (Europe, Asia, Emerging Economy etc.)

175. In the Plan, however, there was exactly one offering in the Plan's menu- the high price Merrill Lynch Equity Index Trust. Consequently, the Plan was never properly diversified. Although the Merrill Lynch Statements included "Disclosures and Important Information," with a sectionentitled "The Importance of Diversifying Your Retirement Savings," there was no reference to the importance of considering low fee funds. No mention was made, in part, because that heading did state "If you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified."

**C. Failing to Operate the Plan for the Exclusive Benefit of Participants and Instead Having a Bias to Use the Placement of the Menu Offerings to Benefit Merrill Lynch**

176. Merrill Lynch used its influence as a fiduciary with the roles of record-keeper or investment adviser to stuff the menu with its own Merrill Lynch or Blackrock funds. Merrill Lynch also stuffed the menu with mutual funds that had agreed or would agree to "fee sharing."

**D. Using Plan Accountholder Assets to Benefit Certain Related Parties to the Plan: Kickbacks Denominated as Fee Income Sharing**

177. As a 401K account, each account-holder, had to self-direct the investments from the menu offered by the plan, consisting of mutual funds or protective trusts. Mutual Funds and Protective Trusts charge fees for their investment acumen in selecting stocks, bonds or short-term interest instruments.

178. For all or a substantial period of the years in question, 1991 to date, the Appeal process disclosed that a portion of the fees being paid by the Plan Accountholders to mutual funds and protective trusts for investment acumen to select winning stocks, bonds or short term interest instruments, was instead kicked back to Merrill Lynch which divided the kickback with the Plan Sponsor which was participating in the kickback arrangement with the approval of the Plan Trustees.

179. This arrangement, which Merrill Lynch and the Plan Sponsor denominated revenue sharing, was never disclosed to the Account-holders. In second quarter of 2012, for the first time, the account statements included a note relating to "indirect revenue", but even that notice constituted an omission and false representation of a material nature.

180. As an example, in one (unidentified) year Merrill Lynch received or was proposing to receive "indirect credits" (kickbacks) from fees paid by the Plan Account-Holders, of from 0.09% (or 9 basis points) to 0.50% (or 50 basis points) from each of the Menu

offerings. This resulted in $286,971 in "revenue share" kickbacks with Merrill Lynch requiring that it receive 0.13% (or 13 basis points) of that revenue, leaving $133,411 for the Plan Sponsor.

181. A brief statement was included in the participant's account statements for the 2nd Quarter of 2012:

> **"Important Information: Some plan administrative expenses may be covered through indirect revenue received from annual operating expenses of the investments offered through the plan."**

Administrative expenses for the Plan annually disclosed to the Account-Holders are only approximately $10,000. Thus, the disclosure was completely fraudulent, deficient and constituted knowing omissions and false representations of a material nature. This was a complete breach of the fiduciary duty owed to participants and beneficiaries under ERISA.

182. Ignoring the repeated warnings of DOL in its Advisory Opinions (most recently AO 2013-03A), the DOL Amicus Curiae filing in the **Tussey** case, the DOL/EBSA rules and regulations, the fee sharing arrangement described is a violation of the ERISA duties of the Plan fiduciaries on several levels. First, a preference for mutual funds that provided indirect credits/kickbacks, skewed the choices for the menu selection and precluded low fee mutual funds that did not grant such credits. Second, the ERISA fiduciary duty must necessarily accord with the DOL's rulings as well as meet the requirements to avoid the prohibitions of Offer, Acceptance, or Solicitation to Influence Operations of a Plan (18 U.S.C. 1954).

### E. Damages

183. In the "Appeal" process, although plaintiff was denied a hearing, he did provide the exhibits that would have been used. One related to damages, and for that he compared his present eight investment savings holdings, using the Vanguard calculator to show that over 20 years in a managed fund to managed fund calculation a portfolio of 8, $50,000 positions, would cost the accountholder $267,000 in value because of high fees.

184. In fact, the DOL website points out the impact of fees and the damages that can occur over time. So does the SEC website. Both websites and bulletins have calculations and charts showing that funds that have low fees result in a large beneficial change of value in the account over 10-20 years.

185. Damaged can also be calculated form the "kickback" from mutual funds in the Plan for which the participants were paying fees. In the example pleaded above for a $100 million Plan for which participants paid approximately $825,000 in fees, $286,000 was "kicked back" or "shared" with Merrill Lynch. Merrill Lynch was to keep $178,000 of that amount, leaving a revenue share available amount of $133,000, which the Plan sponsor took. Clearly, the entire $286,000 for every year a similar amount was taken, is an measurement that would constitute damages to the Plan and participants. Excessive fees, in a substantial amount, were being charged participants and diverted to Plan fiduciaries.

## COUNT II

### Violation of the Sherman Act Sec. 1- Per Se Unlawful

### And Unreasonable "Rule of Reason Tying"

186. Plaintiff repeats and alleges each and every allegation of paragraphs 1-185 of this

complaint.

187. These claims are brought under Section 1 the Sherman Act, 15 U.S.C. Sec. 1, a Per Se

Unlawful and Unreasonable "Rule of Reason Tying" violation.

188. The Merrill Lynch Record-keeper, Custodian, and Investment Adviser services is a

distinct product or service the purchase of which is made by the Plan Sponsor on behalf of

the Plan and its participants.

189. Merrill Lynch markets and performs these services, which include statements to

participant and beneficiaries of the Plans, throughout the United States using interstate

commerce.

190. Merrill Lynch has market power in these services:

(a) As stated in Merrill Lynch's 2001 Annual Report:

> **Gorman: If you look at the top 25 private wealth management firms in the
> United States, Merrill Lynch is number one. Private clients with assets of
> $1 million or more entrust more money to Merrill Lynch than any other
> Firm. What's more, we are the only firm with the ability to deliver first-
> Class service and support to smaller households through our Financial
> Advisors, Financial Advisory Centers and comprehensive online resources.
> No other firm can make that claim.**

(b) In its 2007 Annual Report Merrill lynch reported that its Retirement Services group was
responsible for approximately $442 billion in retirement assets for approximately 6.5
million individuals in 39,000 workplace –based retirement programs.

(c) In the 2013 Bank of America Corporation Annual Report Merrill Lynch Global Wealth
Management had revenue of $14.8 billion.

191. The Unregistered Collective Funds are a separate product; the Merrill Lynch Roster or Slate of Mutual Fund candidates to be selected from to form a Plan menu of Mutual Fund options, is a separate product.

192. Merrill Lynch used its market power and fiduciary duty in its Record-keeper, Custodian or Investment Advisor product role, to tie (a) the Unregistered Collective Funds to the Plans Menu and (b) "fee sharing/kickback" mutual funds to the Plan.

193. Merrill Lynch foreclosed competition from other lower fee "nonsharing" mutual funds and low fee index funds.

194. The agreement to the tied product was made by the Plan Sponsor and by virtue of that fact, there is a direct relationship between Merrill Lynch and the participants and beneficiaries for which both the "tie" and the foreclosure of completion from low fee index funds applied.

195. The participant and beneficiaries are the direct purchaser of the tied product, the unregistered collective trusts. Plaintiff was the direct purchaser.

196. Plan Sponsor's who knew of the fee-sharing arrangement or participated in that arrangement were also agreeing to a supracompetitive price charged to participants and beneficiaries which is also a violation of the Sherman Act

197. Plaintiff was injured and damaged because the tying arrangement effected a supra-competitive fee cost for the fund fees paid to the unregistered Collective Trusts.


**COUNT III**

**Violation of NY General Business Law Section 349**

198. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-197.

199. The acts alleged above constitute a deceptive trade practice prohibited by NY CLS Gen Bus Section 349.

200. Each defendant is subject to the law of New York in its business dealings.

201. As a result of this violation, plaintiffs have been damaged.

## FRAUDULENT CONCEALMENT

202. Defendants concealed and did not disclose fee sharing arrangements, and still have not done so. Further by foreclosing participants and beneficiaries, who are trapped by only the menu choices in making their investments, from the choice of low fee funds, have knowingly misled those participants.

203. As a result of the fraudulent concealment, plaintiff asserts the tolling of any statute of limitations affecting the rights of plaintiff and the members of the class.


PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for relief and judgment as follows:

A. Determining that this action is a proper class action, certifying plaintiff for the Plan and as a beneficiary, as Class representative under Rule 23 of the Federal Rules of Civil Procedure and designating this Complaint as the operable complaint for class purposes;

B. Awarding compensatory damages in favor the plaintiff and the other Class members against all defendants, jointly and severally, for all damages and treble damages sustained as a result to defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.  Awarding such other and further relief as the Court may deem just and proper.

JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: March 14, 2015

Respectfully submitted

/s/  Craig M. Walker

Craig M. Walker 3778
Walker Law LLP
P.O Box 19
Pound Ridge, N.Y. 10576
Phone: 917-880-7686;
Craig_M_Walker@sbcglobal.net