**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------X

| | |
|---|---|
| CRAIG M. WALKER, On Behalf of the Clifford Chance US LLP 401(k) Plan, and All Other Plans Similarly Situated,                           : : : : **Plaintiff,** : :    - vs. -                                 : : **MERRILL LYNCH & CO. INC., BANK OF AMERICA CORPORATION, MERRILL LYNCH BANK & TRUST FSB, CSIG FINANCIAL ADVISORS**             : : : : **Defendants.** : | No. 1:15-cv-01959 (PGG)<br><br><br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

-------------------------------------------------------------------------X

      Plaintiff, Craig M. Walker for the Clifford Chance US, LLP Tax Deferred Savings and Profit Sharing Plan ("Plaintiff"), by and through its undersigned counsel, in support of this Complaint, hereby pleads and avers as follows:

## I.    INTRODUCTION

    1.  Personal savings accounts in the form of 401(k) and other defined contribution plans have become the primary method for employees in the United States to save for retirement in recent years. The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit ("DB") plans have become increasingly rare as an offered and meaningful employee benefit.

    2.  Merrill Lynch (defined below) acts as the "service provider" and a fiduciary for thousands of 401(k) retirement plans in the United States.

    3.  Merrill Lynch has entered into revenue sharing agreements and similar arrangements ("revenue sharing contracts" or "participation agreements") with various mutual funds,

affiliates of mutual funds, mutual fund advisors, sub-advisors, investment funds, including collective trusts, and other investment advisors, instruments or vehicles (collectively, "mutual funds"), pursuant to which Merrill Lynch receives revenue sharing payments (which amount to kickbacks) for its own benefit from these mutual funds in violation of, *inter alia*, the prohibited transaction rules of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§1001, *et seq.* (*i.e.*, ERISA §§ 404 and 406(b), 29 U.S.C. §§ 1104 and 1106(b)), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)) and the prohibitions of 18 U.S.C. § 1954 and N.Y. GBL § 349.

## Summary of the Allegations of this Amended Complaint

## The 1997 Trust Agreement

4.  On March 7, 2016 the Plan Sponsor Clifford Chance ("CC"), produced in response to a request of Mr. Walker, The Trust Agreement between Merrill Lynch Trust Company, as Trustee and Rogers & Wells, as the employer. This was the Trust Agreement under which the Plan was operated.

5.  In Article VI of that Trust under the heading *Responsibilities and Indemnity*, it provides:

> 6.03 **Status of Trustee.** The Trustee acknowledges its status as a "fiduciary" of the Plan within the meaning of ERISA.

6.  In Article IV of that Trust under the heading *Payments, Administrative directions and Expenses,* it provides:

> 4.04 **Trustees Compensation and Expenses.** If the Employer so elects…
> the Employer shall (a) pay the Trustee compensation for its services under
> this Trust Agreement in accordance with the Trustee's fee schedule… If
> the Employer does not so elect, such compensation and expenses shall be
> charged against and withdrawn from the Trust Fund as provided below.
> …

> By signing this Trust Agreement, the Employer authorizes the Trustee
> and/or its affiliates to receive payments, to the extent permitted by
> applicable law, from certain mutual funds (and/or Collective trusts) …in
> connection with the performance of reasonable and necessary services
> (including recordkeeping, sub-accounting, account maintenance,
> administrative and other shareholder services).

7.   By so doing, Merrill Lynch, as an ERISA Fiduciary as the Investment Adviser,
continued in place or put in place the kickback scheme that is alleged in this First Amended
Complaint. This scheme was combined with two Plan offerings of Merrill Lynch unregistered
Collective Trusts, the Stable Value Collective Trust and the Equity Index Collective Trust.

8.   Merrill Lynch, as Investment Adviser, put these proprietary Collective Trusts in the
CC Plan, as the only Stable Value and Equity Index offerings pursuant to an agreement,
arrangement or understanding that they would be the only offerings of that type. This excluded
low fee passively managed index funds.

9.   Merrill Lynch continued to operate this kickback scheme through the filing of this
action in 2015. As an ERISA fiduciary as Investment Adviser, it put this scheme into effect and
it never changed through 2015. Each year Merrill Lynch was taking kickbacks of hundreds of
thousands of dollars.

10. The plan sponsor, CC, an ERISA fiduciary, joined deriving benefits from the
scheme at some point in time which CC has refused to disclose.

11. As an example, in one particular year, 18 mutual funds and collective trusts received
$852,000 in fees from the Plan's $137 million in assets and kicked back to Merrill Lynch
$286,000 of the fees paid by Plan participants. Of that kickback amount of $286,000, Merrill
took $178,000 and the firm sponsor was allocated $133,000. This document is entitled "Clifford
Chance –Merrill Lynch Proposal" and is a matrix showing each mutual fund (including the

Collective Trusts) made a revenue sharing kickback ranging from 9 basis points ( a basis point or "bps" is one-hundredth of one per cent) to 51 bps. The matrix demonstrates:

(a) The Plan was being operated to generate revenue sharing kickbacks for the benefit of the fiduciaries;

(b) That the scheme inflated the fees paid by the Plan by 50%;

(c) The range of the revenue sharing kickback payments from 9 to 51 bps. shows that they were unrelated to value of any expense;

(d) That the $133,000 was not being used for "administration or accounting" and revenue sharing kickbacks were being paid by the mutual funds for promotion;

(e) The Plan was not being operated in the sole and best interests of the participants.

12. In 2008 CC set up or split the Plan into Plan I and Plan II, without disclosing to participants that this was happening or the reason for it. This action demonstrates a penchant for concealment.

13. In that same year, CC made or Merrill Lynch arranged for, an application for Plan Services. (Filed Doc. 16-1). The *Application for Plan Services- Defined Contribution Part 2, (* filed Doc. 16-2) in this action), contained several parts.

14. The **Retirement Preservation Trust Purchase Agreement**, specifies: "The Trustee hereby acknowledges it is a 'fiduciary' as that term is defined in Section 3(21) of ERISA, of each Plan, with respect to the assets of each plan which are invested in the Trust."

15. It also has the investment fiduciary represent and warrant: "I**. No Participating Plan offers participants therein into a money market fund, bank deposit, other GIC, a short- term bond fund…or other instrument having similar characteristics.**"

16. The **Retirement Preservation Trust** specifies: "The Trustee [Merrill Lynch Bank

USA] hereby acknowledges that is a fiduciary of each Participating Plan, with respect to the management and control of the assets invested in the Trust by such Participating Plan."

17. The **Merrill Lynch Advice Access Agreement** specifies: "It [Merrill Lynch] is acting as a "fiduciary" as defined in Section 3(21) of ERISA with respect to providing the investment advisory services of Merrill Lynch Advice Access, provided, however, Merrill Lynch shall not be the fiduciary responsible for the obligations set forth in Sections 2(E) [selection of the investment options under the Plan] and 2(F) [Employer is responsible for 'any specific investment restrictions' and 'it's selection of the Merrill Lynch Advice Access options.'"

18. The **Mutual Fund Fee Disclosure** document (filed document 16-2 pp. 59-61) discloses "Merrill Lynch's investment related compensation relating to your plan's investment portfolio comes primarily from three sources:

1. Merrill Lynch Related Products-…[Merrill Lynch collective trusts]
2. Alliance Network Funds- Merrill Lynch receives Investment Related Compensation from mutual fund providers participating in the Alliance Network, (including BlackRock)… [This 'Alliance Network' includes over 3000 mutual fund and collective trust option maintained by Merrill Lynch that are made available to plan sponsors for their 401k plans].
3. Black Rock Funds

19. The document specifies "In most cases, Alliance Network fund families pay Merrill Lynch a Service Fee equal to the product of twenty basis points (0.20%) and annual average assets invested in the fund."

20. The **Trust Agreement Between Merrill Lynch Bank & Trust Co., FSB and Employer**,( filed document 16-2 pp.68-770 contains a provision relating to the kickback scheme:

<u>Article IV- Payments, Administrative Directions and Expenses</u>

4.04 Trustee's Compensation and Expenses…
(e) "By signing this Application Agreement the Employer authorizes the Trustee and/or its affiliates to receive payments from mutual funds (and/or collective trusts in which the Trust invests (or from the principal distributors and/or advisors of those funds or trusts), in connection with the performance of reasonable and necessary services (including recordkeeping, sub-accounting, account maintenance, administrative and other shareholder services."

21. That Trust Agreement also specified: 6.03 **Status of Trustee. The Trustee acknowledges it** status **as a "fiduciary" of the Plan within the meaning of ERISA, in its capacity as a non-discretionary directed trustee."**

22. This provision admits that Merrill Lynch is an ERISA Fiduciary, but the claim it is a non-discretionary directed trustee is a falsehood because the kickback scheme to structure the Plans with high fee actively managed funds was baked into the Trust Agreement. The Trust Agreement is the bedrock of every 401K Plan governed by both the Internal Revenue Code and ERISA. It is the mainstay of assuring every participant that their contributions are secure and that there is no improper deterioration of Plan Assets and their accounts. The Trustee owes a duty of absolute loyalty to the Participants and a fiduciary duty to act in the sole interest of the participants. The Trustee is the gatekeeper to making sure that any expenses deducted from Plan Assets is reasonable and lawful. Here the Merrill Trustee breached those duties.

23. In summary, the baked in elements of the Trust Agreement included the following:

1. The investment strategy and structure of making the Plan focus of high fee actively managed funds which would pay a revenue sharing kickback to Merrill Lynch acting as an ERISA fiduciary.
2. In every year, Plan assets were used to pay inflated fees to mutual funds that made a revenue sharing payment to Merrill Lynch unrelated to any expense deduction authorized under ERISA.
3. Keeping out competitive low-fee passively managed funds which did make revenue sharing kickbacks.

6

    4.   Causing a substantial loss over a multi-year period to the Plan and each participant's account.

24. Further, as alleged below, Merrill Lynch, in the mid-2000's transferred its family of mutual funds to BlackRock taking a substantial ownership in that company. Thereafter, Merrill Lynch trumpeted:

> **"Our proprietary funds are managed by BlackRock, one of the world's largest investment management firms."**

25. Around the same time, with its investment structure in place, Merrill Lynch stepped out of its role of selecting the specific mutual funds for a particular Plan, but continued an investment adviser role with its "Merrill Lynch Advice Access" program. Advice Access provided advice directly to participants and in that role Merrill Lynch contracted with the investment adviser Ibbotson Associates, Inc. [see Doc. 16-2 filed in this action]. As quoted above, Merrill Lynch committed to be an ERISA fiduciary in that investment advisory function, as part of the Advice Access program.

26. As Merrill Lynch, itself, states:

> **"Merrill Lynch Advice Access provides specific, unbiased savings and investment recommendations to each 401 (k) participant….And Merrill Lynch stands behind the advice given by accepting fiduciary responsibility for delivery of the service."**

27. All of the above, BlackRock, the Plan Investment Adviser, CSIG and Advice Access investment adviser were required to work within the Merrill Lynch scheme and structure alleged above.

28. Merrill Lynch was put on notice that its scheme and structure was subject to attack under ERISA with the ruling by the United States Court of Appeals for the Eighth Circuit in ***Braden v. Walmart et al. 588 F.3d 585 (2009)***. This action falls within the parameters of the

*Braden* case and not the *Hecker* line of cases.

29. As alleged below, the Merrill Lynch scheme and structure was fraudulently concealed from Plan Participants. In 2012, the DOL-EBSA finalized a disclosure rule and thereafter Merrill Lynch and Plan Sponsors struggled with the disclosure. Merrill Lynch/ Bank of America did, however, end and liquidate its unregistered Equity Index Trusts. But in the Clifford Chance Plan, the scheme stayed in place with one low-fee passively managed equity index fund. The disclosure for the Clifford Chance Plan- the "Plan Disclosure Document" in August 2012, included the following:

> **"2. Administrative Expenses Information**
> **…The Plan's service provider may receive investment-related revenue from one or more of the Plan's investments for providing the above-described administrative services. The Plan Sponsor and service provider have agreed upon 0.1150% [11.5 bps] of Plan Assets."**

30. This is an express and stark admission that "Plan Assets" had been and continued to be used in the Merrill Lynch scheme and structure.

31. After this action was filed in March 2015, additional admissions were made. In the summer of 2015, the Clifford Chance representative Plan added three more low-fee passively managed index funds (a total of 4).

32. **Additionally, the Clifford Chance Plan Sponsor and Merrill Lynch lowered yearly slice of Plan Assets taken to 0.0700%  (7 bps) of Plan Assets.**

33. As a result of the foregoing it is established that:

(a) Merrill Lynch was an ERISA fiduciary as a Trustee of the Plan, as a Trustee of the Collective Trusts, and in its Advice Access program.

(b) Merrill Lynch owed a duty of trust and good faith to act in best interests of the

Plan and its participants to maximize Plan assets and not to cause any deterioration of Plan assets.

(c) Merrill Lynch breached that fiduciary duty by prohibited self-dealing under ERISA and violating the provisions of the anti-kickback statutes.

(d) By taking steps to prevent the Plan menu offerings of low fee passively managed index funds. Participants were thus deprived of having an opportunity to maximize their accounts which formed Plan assets held in trust.

(e) Merrill Lynch, CSIG, and the Plan Sponsor had an absolute fiduciary duty to include in the menu offering low-fee passively managed index funds, and instead those parties used Plan Assets to maintain an investment strategy entirely focused on high fee actively managed funds paying revenue sharing kickbacks; all in violation of the statutes alleged in these claims.

34. The damages caused by the Merrill Lynch scheme and structure are alleged below. Examples are provided of the low fee passively managed index funds with fees of 3 to 10 bps. Every plan should have had a compliment or bevy of such menu offerings. Consequently the Plan was damaged by;

(a) The inflated fees paid each year for funds which made revenue sharing kickbacks to Merrill Lynch.

(b) The compound damage to the assets of the Plan from the acts of Merrill Lynch in preventing of menu offerings of  low fee passively managed index funds.

## II. THE PARTIES

35. Plaintiff is a participant of the Clifford Chance 401(k) Retirement Savings Plan (the "Clifford Chance Plan" or the "Plan") which was operated through an Internal Revenue Code §

Trust. Merrill Lynch acted as a service provider for and a fiduciary of the Plan and its Trust.

36. Defendant Merrill Lynch Co. Inc., is a Delaware corporation, with its headquarters in New York City, which offered capital market services, investment banking and advisory services, wealth management, asset management, and other services throughout the United States and world. One of its principal subsidiaries is Merrill Lynch, Pierce, Fenner,& Smith Inc. which is a registered broker-dealer and both Merrill companies are wholly owned subsidiaries of Bank of America Corporation as are numerous other corporate entities all referred herein to as "Merrill Lynch".

37. Defendant Bank of America Corporation is a large national bank with its headquarters in Charlotte, North Carolina, and operations in all 50 states. It is a public company listed on the New York Stock Exchange.

38. Bank of America holds Merrill Lynch as one of its five major subsidiary groups under the group heading "Global Wealth & Investment Management." As a Bank of America subsidiary, Merrill Lynch Global Wealth Management provides, through a network of financial advisors, services focused on clients with more than $250,000 in investable assets; US Trust focuses on clients with more than $5 million in investment assets; on the lower end, Merrill Edge focuses on clients with less than $250,000 in investable assets.

39. Defendant, Merrill Lynch Bank & Trust, FSB ("Merrill Trust"), also is a Bank of America and Merrill Lynch company and serves as the Trustee to the Plan. Upon information and belief Merrill Trust acted as Trustee for all plans where Merrill Lynch was the service provider. Merrill Trust is a fiduciary to the Plans within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

40.  Each of the Defendants is legally responsible for the actionable conduct detailed in

this Complaint since the revenue-sharing scheme was embedded in the Trust Agreement and the procedures of Merrill Lynch and Merrill Trust have operated from and through a mechanism of centralized control within Merrill Lynch Retirement.

41. Defendant, Clear Sailing Investment Group ("CSIG"),  is a co-fiduciary of the Plan and provides investment advice to the Plan Sponsor (CC). CSIG is a firm of six certified financial planners and advisers located in several states that does business in this judicial district. CSIG is a fiduciary of the Plan, as the Investment Adviser within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A). When it came onboard, CSIG worked within the Merrill Lynch scheme alleged below and was involved in the negotiations of the amount Merrill Lynch would receive from the revenue sharing kickbacks.

## III. JURISDICTION AND VENUE

42. Plaintiff seeks relief on behalf of the Clifford Chance Plan and all other similarly situated Merrill Lynch  Plans with Merrill Lynch Trusts, pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

43. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

44. Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Merrill Lynch maintains its headquarters and principal place of business in New York, New York.

## IV. FACTS APPLICABLE TO ALL COUNTS

## The Services That Merrill Lynch Provides To The Plans

45. At all pertinent times, Merrill Lynch has held itself out and continues to hold itself out to the Plans, Plaintiff, and the Class as providing a full array of services, and represents that Merrill Lynch can help design and maintain a long-term retirement strategy for a company and its employees.

46. As the 2008 "The Retirement Group at Merrill Lynch" brochure states:

> "Looked at another way, the Retirement Group is like getting several exceptional service providers all rolled into one. Often, getting exemplary products, services and access to a broad range of investments means working with multiple providers. At Merrill Lynch, we're proud to offer comprehensive solutions for:
>
> - Defined Contributions Plans—401(k)
>
> …
>
> **We help plan sponsors**:
>
> - **Meet fiduciary requirements and reduce litigation exposure** – by providing helpful guidance and drafting many required filings for your review and signature.
> - **Choose investment menus and funding mechanisms** – from a wide array of options for all types of plans."

Another service that Merrill Lynch provides is to prepare all or most of the communications with Participants. Several examples are set out below.

47. The 2002 Merrill Lynch Annual Report sets out these characteristics of the company:

> "Similarly, the retirement sector represents an important opportunity. Today Merrill Lynch serves more than 21,000 workplace-based retirement programs, and more than five million individuals with retirement accounts. A leading industry survey now ranks Merrill Lynch as one of the top-quality 401k providers."

48. In Merrill Lynch's 2007 Annual Report, additional growth in those numbers is shown:

"*Retirement Services*
The Merrill Lynch Retirement Group is responsible for approximately $442 billion in retirement assets for approximately 6.5 million individuals. This group provides a wide variety of investment and custodial services to individuals in the United States through Individual Retirement Accounts ("IRAs") or through one of approximately 39,000 workplace-based retirement programs serviced by the group. We also provide investment, administration, communications and consulting services to corporations and their employees for their retirement programs. These programs include equity award and executive services, 401(k), pension, profit-sharing and non-qualified deferred compensation plans, as well as other retirement benefit plans."

49. The revenue sharing payments at issue are essentially part of a pay-to-play scheme in which Merrill Lynch receives payments from actively managed mutual funds, other indirect compensation and/or similar fees (the "revenue sharing payments" or "RSPs") in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.

50. Merrill Lynch made arrangements to receive revenue sharing payments from a group of Mutual Fund Families. As described in the **"Mutual Fund Fee Disclosure"** (Doc. 16-2 filed in this action,) pp 59-61:

**Our Mutual Fund and collective trust investment products are referred to as our "Alliance Network". His "Alliance Network" includes over 3000 mutual fund an collective trust investment options maintained by Merrill Lynch that are made available to plan sponsors for their 401k plans….**
**In most cases, Alliance Network fund families pay Merrill Lynch a Service Fee equal to the product of twenty basis points (0.20%) and annual average assets invested in the fund.**

51. Merrill Lynch also otherwise earns substantial fees and improperly influences its own compensation through a variety of other means detailed in:

(a) The Mutual Fund Fee Disclosure and

(b) In securities lending of securities in its own Collective Trusts and authorized

securities lending of Plan Asset holdings.

In short Merrill Lynch make a substantial amount of money from the 401K Plan business over and above what it receives from the revenue sharing kickback scheme.

52. Merrill Lynch invests the retirement assets of the Plan (defined below) and the Plans in the mutual funds generally through Trust Agreements, and through each Trust by which it accomplishes such investments, Merrill Lynch influences its own compensation by virtue of the scheme alleged, earns excessive compensation and otherwise fails to act in the best interests of the retirement plans it services and their participants.

53. These assets of the Plan were placed in the Trust and mutual funds, one of which is managed and operated by a Merrill Lynch affiliated entity, which pays Merrill Lynch RSPs in connection with these Plan Trust Accounts in violation of ERISA.

54. Merrill Lynch uses control over these separate trusts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are generally deducted directly from the retirement assets of the Separate Plan Trusts. Merrill Lynch has acknowledged its fiduciary status under ERISA, *inter alia,* by a Trust admission of its status as a fiduciary under ERISA, by virtue of its control of these Trust Accounts, as well as the discretion, authority and control it holds and exercises with respect to the Separate Trusts.

55. A common or collective trust ("Collective Trust") is an instrument by which a trustee holds the assets of many company traded securities of bonds under one trust instrument.

56. Merrill Lynch had two such proprietary trusts—the Retirement Preservation Collective Trust (Stable Value Fund) and the Equity Index Collective Trust. Both were unregistered and as such did not provide information to participants or reports to the United States Securities Exchange Commission. This should have dramatically lowered fee costs, but instead they were more expensive and both made revenue-sharing payments to Merrill Lynch. This fee-sharing was in essence Merrill Lynch transferring fee payments made by participants to Merrill Lynch itself. As alleged, as part of Merrill Lynch's scheme, these Collective Trusts were placed in the Plans with the proviso they would be the only Stable Value Fund and Equity Index Fund.

57. Merrill Lynch, by and through Merrill Lynch Trust, enters into individual trust agreements ("Trust Agreements") with the Plans, including the Plan, pursuant to which the retirement assets of the Plans are invested in mutual funds through trusts, which operate the Plan.

58. In light of the nature of its trust agreements with its retirement plan sponsors, the Trusts operate with Merrill Lynch taking dominion over the retirement assets in these trusts including as a licensed broker-dealer holding Plan assets in street name.

59. Merrill Lynch uses its control over separate accounts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are deducted directly from the assets of the separate accounts.  Merrill Lynch has acknowledged its fiduciary status under ERISA by, *inter alia,* by agreement and by virtue of its ownership and control of these Trusts, as well as the discretion, authority and control it holds and exercises with respect to these trusts.

60. The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by Merrill Lynch and/or based on the magnitude of the investments by such retirement plans in the mutual fund.

61. While the revenue sharing payments are often internally described by service providers, such as Merrill Lynch, as "services fees" and reimbursement for expenses incurred in providing services for, to, or on behalf of the mutual funds, and deceptively characterized as such to retirement plans and their participants (thereby concealing their true nature), the amounts of the revenue sharing payments bear absolutely no relationship to the cost or value of any such services. Indeed, Merrill Lynch performs the same services, the payment for which is the responsibility of the Plan Sponsor, regardless of the amount of revenue sharing payments, if any, made to it. As a result of its acceptance of these unlawful payments, Merrill Lynch occupies a conflicted position whereby it effectively operates a system in which it is motivated to increase the amount of such payments, while improperly requiring certain plans and/or participants who invest in mutual funds and similar investments that provide higher amounts of revenue sharing payments to incur and pay unreasonably high fees for the services provided.

62. The services provided by Merrill Lynch that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that Merrill Lynch has historically provided to its retirement plan sponsors as a necessary part of its business in return for fees directly collected by it from such sponsors.

63. Merrill Lynch's receipt of the revenue sharing payments at issue violates ERISA's prohibited transaction and fiduciary duty rules and should not be countenanced since the receipt of such payments places Merrill Lynch in a conflicted position in which, *inter alia,* the interests

of its retirement plan participants can be and are sacrificed in the interest of Merrill Lynch earning greater profits through the receipt of revenue sharing payments.

64. As explained below, Merrill Lynch also has engaged in acts of self-dealing with respect to the retirement assets of the Plans and the Class held in the Trusts, as well as with respect to certain proprietary mutual funds and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well ERISA's fiduciary rules.

65. The Plan Sponsor—Clifford Chance US LLP (CC) has breached its fiduciary duties by causing the Plan to pay grossly excessive fees to Merrill Lynch and certain mutual funds with respect to the retirement services provided to the Plan and/or by participating in the conduct of Merrill Lynch and, as a result of such breaches of fiduciary duty, the Plan has suffered significant harm and losses.

66. This is an action for equitable relief and losses suffered under ERISA in which Plaintiff seeks to recover, for the benefit of the 401(k) plans in the Class and all other similarly situated retirement plans and entities (collectively, the "Plans"), also known as employee pension benefit plans under ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) that are subject to Internal Revenue Code Sections 401(a) and 401(k), as well as the Sub-Class (defined below), the revenue sharing payments and other compensation that Merrill Lynch has improperly received, as well as the excessive compensation that has been paid by the Plan, its participants and beneficiaries as a result of the Sponsor Clifford Chance's breaches of fiduciary duty.

67. Plaintiff brings this action on behalf of the Plan and on behalf of all other similarly situated Plans under ERISA §§ 409(a) and 502(a) and (g), 29 U.S.C. §§ 1109(a) and 1132(a) and (g), to recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;
- A permanent injunction against Defendants prohibiting the practices described herein;
- Disgorgement and/or restitution of all the revenue sharing payments and other compensation improperly received by Merrill Lynch, or, alternatively, the profits earned by Merrill Lynch in connection with its receipt of such revenue sharing payments and other unlawful compensation;
- Damages in the form of all losses suffered by the Plans and all other recoverable damages;
- Attorneys' fees, costs and other recoverable expenses of litigation; and
- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## **The Trusts**

68. Merrill Lynch operates the Plans through Trusts qualifies under Section 401(a) of the Internal Revenue Code and the Plan's participant account is a 401k under that Section.

69. The Trusts are established, administered, owned and managed by Merrill Lynch (*i.e.*, Merrill Lynch Trust Company) and the assets of the Trusts are segregated from the general assets of Merrill Lynch.

70. The Trusts permit Merrill Lynch to pool the investments of the Plans or one of the given Plans before collectively investing them in mutual funds and similar investment vehicles. The assets of each of the Trusts are segregated (or separate) from all of the other assets of Merrill Lynch. The Trusts purchase and own selected mutual funds or other funds/investment vehicles.

71. The Trusts maintained by Merrill Lynch correspond to and/or are divided into sub-accounts that correspond to the mutual funds and other investment options available under the Trust Agreement and Contracts that Merrill Lynch maintains with the Plans.

72. The Trusts (or their sub-accounts) are divided into accumulation units (sometimes

referred to as "record units" or "participation units") that track the performance of shares of a selected investment with the price per accumulation unit calculated by dividing the total value of the assets of one of the Trusts by the number of units in such Trust.

73. The Trusts permit Merrill Lynch to pool the investments of the participants of one of the Plans before collectively investing them in mutual funds and similar investment vehicles. The assets of each of the Trusts are segregated (or separate) from all of the other assets of Merrill Lynch. The Trusts purchase and own selected mutual funds or other funds/investment vehicles.

74. Participants may choose the mutual funds in which their contributions and any matching contributions made by their employers are invested, and Merrill Lynch allocates those contributions to particular Trusts or sub-accounts within the Trusts that correspond to the chosen mutual funds. In return for the contributions, which are assets of these ERISA-qualified plans, the Plans and their participants receive accumulation units (shares) in the applicable sub-accounts of the Trusts, which accumulation units, like the Trusts themselves and the sub-accounts, are held and owned by Merrill Lynch.

75. Merrill Lynch takes legal title to all retirement assets of the Plans that it holds in the Trusts.

76. Pursuant to its agreements with the Plans, Merrill Lynch Trust agrees to acts as a fiduciary and to abide by all applicable fiduciary standards by discharging "its duties with respect to the [P]lan solely in the interest of the participants and beneficiaries with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in the like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

77. However, Merrill Lynch embeds in the Trust Agreements the investment structure and scheme alleged in this Amended Complaint, which is best shown by looking at the CC Plan itself.

## The 1997 Trust Agreement

78. The Trust Agreement dated July 1, 1997 between Merrill Lynch Trust Company, as Trustee, and Rogers & Wells (The predecessor to CC), as the employer, was the Trust Agreement under which the Plan was operated.

79. In Article VI of that Trust under the heading *Responsibilities and Indemnity*, it provides:

> "6.03 **Status of Trustee**. The Trustee acknowledges its status as a 'fiduciary' of the Plan within the meaning of ERISA."

80. In Article IV of that Trust under the heading *Payments, Administrative directions and Expenses, it provides:*

> "4.04 **Trustees Compensations and Expenses**. If the Employer so elects…the Employer shall (a) pay the Trustee compensation for its services under this Trust Agreement in accordance with the Trustee's fee schedule…If the Employer does not so elect, such compensation and expenses shall be charged against and withdrawn from the Trust Fund as provided below.
> …
> **By signing this Trust Agreement, the Employer authorizes the Trustee and/or its affiliates to receive payments, to the extent permitted by applicable law, from certain mutual funds (and/or Collective trusts) …in connection with the performance of reasonable and necessary services (including recordkeeping, sub-accounting, account maintenance, administrative and other shareholder services)."**

81. The underlined portion, "By signing this agreement," had the effect of co-opting and enticing the employer Plan Sponsor to participate in the scheme to lower its costs and

improperly use Plan assets to cover the employer Plan Sponsor's responsibilities.

82. The underlined portion "to the extent permitted by applicable law" triggered the following legal mandates: (a) prohibited transactions under ERISA, (b) the Federal improper influence on a Plan prohibition and (c) the New York anti-kickback statute.

83. By pursuing this investment structure and strategy, Merrill Lynch, as an ERISA fiduciary (as the Trustee, and Investment Adviser, continued in place or put in place the kickback scheme that is alleged in this First Amended Complaint. This scheme was supplemented and pursued by placing in the Plan offerings two Merrill Lynch unregistered Collective Trusts, the Stable Value Collective Trust and the Equity Index Collective Trust.

84. The Trust Agreement authorizes investment in those unregistered Collective Trusts as follows:

> "**5.06 Common and Collective Trust Funds.** Any person authorized to direct the investment of Trust assets may, if the Trustee and the Named Investment Fiduciary so permit, direct the Trustee to invest such assets in a common or collective trust maintained by the Trustee or its affiliate for the investment of assets of qualified trusts under section 401(a) of the Code, individual retirement accounts under section 408(a) of the Code and plans or governmental units described in section 818(a)(6) of the Code. The documents governing any such common or collective trust fund maintained by the Trustee or its affiliate, and in which Trust assets have been invested, are hereby incorporated into this Trust Agreement by reference."

85. Merrill Lynch, by agreement, arrangement or understanding, placed these proprietary Collective Trusts in the CC Plan, with the condition that they would the only Stable Value and Equity Index offerings; excluding other offerings of that type including all low fee passive index funds.

86. In putting this scheme into the Trust Agreement, Merrill knew five important facts

which are at the heart of the wrongdoing alleged:

1. Over time the shares in almost every high-fee actively managed fund would rise in value;
2. This would mean that the revenue sharing payments would increase over the same period of time, adding to Merrill Lynch's financial bottom line of profits.
3. This taking of Plan assets would be hidden from the participants who would see their account rising in value and think they were doing alright.
4. Even though the shares of an actively managed mutual fund would increase in value, over 75% of those mutual funds cannot and did not meet a comparable index over time. And a low-fee passively managed index fund was designed to meet the results of the index it was tied to. Thus, an index fund would beat the results of an actively managed fund 75%-90% of the time.
5. Revenue sharing would be a powerful enticement for a Plan Sponsor to lessen or avoid paying its fiduciary mandated responsibilities. The Plan Sponsor would become as addicted to revenue sharing kickbacks as Merrill Lynch was so addicted.

87. Merrill put this scheme into effect when it was the investment adviser, had the full power and control of selecting all the offerings for the Plan, and had all fiduciary responsibilities for the Plan. This scheme has stayed in place, until some modifications were made in the CC Plan six months after this action was filed, in March 2015.

88. In each year, the participants' paid fees on their mutual fund holding had a substantial portion of those fees was being "shared" or kicked back to Merrill Lynch. Each year it was taking kickbacks of hundreds of thousands of dollars.

89. The Plan Sponsor, CC, an ERISA fiduciary, joined deriving benefits from the scheme at some point in time, which CC has refused to disclose.

90. As an example, in one particular year, 18 mutual funds and collective trusts received $852,000 in fees from the Plans $137 million in assets and kicked back to Merrill Lynch $286,000 of the fees paid by Plan participants. Of that kickback amount of $286,000, Merrill took $178,000 and the firm sponsor was allocated $133,000. Pleaded above are all the ramifications and allegations of the breaches of ERISA fiduciary duty and violations of law

91. In 2008 CC set up or split the Plan into Plan I and Plan II, without disclosing to

participants that this was happening or the reason for it.

92. In that same year, CC made, or Merrill Lynch arranged for, an application for Plan Services. Filed Doc. 16-1. The *Application for Plan Services- Defined Contribution Part 2* filed Doc. 16-2, contained several parts:

> **"The Trustee hereby acknowledges it is a 'fiduciary' as that term is defined in Section 3(21) of ERISA, of each Plan, with respect to the assets of each plan which are invested in the Trust."**

93. It also has the investment fiduciary represent and warrant:

> **"I. No Participating Plan offers participants therein into a money market fund, bank deposit, other GIC, a short-term bond fund…or other instrument having similar characteristics."**

94. This provision re-affirmed the investment structure that the Plans could have only one Stable Value Fund and one Equity Index Fund, foreclosing Plan menu offerings of low fee, passively managed funds.

95. The **Retirement Preservation Trust** specifies:

> **"The Trustee [Merrill Lynch Bank USA] hereby acknowledges that it is a fiduciary of each Participating Plan, with respect to the management and control of the assets invested in the Trust by such Participating Plan."**

96. The **Merrill Lynch Advice Access Agreement** specifies:

> **"It [Merrill Lynch] is acting as a "fiduciary" as defined in Section 3(21) of ERISA with respect to providing the investment advisory services of Merrill Lynch Advice Access, provided, however, Merrill Lynch shall not be the fiduciary responsible for the obligations set forth in Sections 2(E) [selection of the investment options under the Plan] and 2(F) [Employer is responsible for 'any specific investment restrictions' and 'it's selection of the Merrill Lynch Advice Access options.']"**

97. Having put in place its scheme, Merrill Lynch had to have its Advice Access service work within the confines of that scheme. Essentially it was dictating to the Advice Access team

to conform its advice to the menu options in the Plan, which Merrill Lynch knew would be high-fee actively managed equity funds.

98. The **Mutual Fund Fee Disclosure** (Docu. 16-2 pp. 59-61 filed in this action) includes an admission that the revenue sharing kickbacks (called "Investment Related Compensation") is handsome and excessive when Merrill Lynch boasts that its deals with the Alliance network, "**allow us to establish attractive levels of Investment Related Compensation**."

99. The disclosure reminds the Plan Sponsor that it should be responsible for the "Administrative Fees":

> "Merrill Lynch's 'Administrative Fee Compensation' is paid pursuant to the fee schedules set forth in the applicable recordkeeping, securities account and trust services agreements. These fees may be paid by the plan sponsor, or they may be treated as a cost of administering the plan and paid from trust assets."

100. The **Mutual Fund Fee Disclosure** (Docu. 16-2 pp. 59-61 filed in this action) discloses:

> "Merrill Lynch's investment related compensation relating to your plan's investment portfolio comes primarily from three sources:
> 1. Merrill Lynch Related Products-…[Merrill Lynch collective trusts]
> 2. Alliance Network Funds- Merrill Lynch receives Investment Related Compensation from mutual fund providers participating in the Alliance Network, (including BlackRock)…[This 'Alliance Network' includes over 3000 mutual fund and collective trust options maintained by Merrill Lynch that are made available to plan sponsors for their 401k plans].
> 3. BlackRock Funds

101. Significantly, the Disclosure mentions the procedures its Alliance network takes to pay the revenue sharing kickbacks to avoid making a disclosure in the mutual fund documentation itself:

"As with Processing Fees, the source of the payments for these services varies by mutual fund company. Some mutual fund companies' service fees are paid by the fund's distributor, while others are paid by the fund's management company or other affiliate or some combination of the foregoing."

102.   What is clear, however, is the following:

1.   The revenue sharing payments are made from the fees paid by participants and;
2.   Merrill Lynch receives about 20 basis points from the kickback arrangement from Plan Assets:
   **"In most cases, Alliance Network fund families pay Merrill Lynch a Service Fee equal to the product of twenty basis points (0.20%) and annual average assets invested in the fund."** (Doc. 16-2, p. 60)

103.   This Mutual Fund Fee Disclosure makes it clear that whatever mutual fund was selected for the Plan's menu was going to pay a revenue sharing kickback. It further starkly shows that there was no way a low-fee passively managed index fund charging 5 to 10 basis points could pay the requisite 20 basis points Merrill Lynch was expecting.

104.   As alleged above, the **Trust Agreement Between Merrill Lynch Bank & Trust Co., FSB and Employer,** contains a provision relating to the kickback scheme. It is established the revenue sharing kickback scheme is embedded in the Trust Agreement and the Trustee was breaching its duty of ERISA fiduciary trust by obtaining an agreement for the self dealing kickbacks.

105.   That Trust Agreement also specified: "6.03 **Status of Trustee. The Trustee acknowledges its status as a 'fiduciary' of the Plan within the meaning of ERISA, in its capacity as a non-discretionary directed trustee.**"

106.   This provision admits that Merrill Lynch is an ERISA Fiduciary. But the claim the Trust is a non-discretionary directed trustee is a falsehood because the kickback scheme to structure the Plans with high fee actively managed funds was baked into the Trust Agreement.

107.     In summary, the baked in elements of the Trust Agreement included the

following:

1. The investment strategy and structure of making the Plan focus on high fee
   actively managed funds, which would pay a revenue sharing kickback to
   Merrill Lynch acting as an ERISA fiduciary.
2. Merrill Lynch annually taking a percentage slice of Plan assets that was
   unrelated to the value of its record keeping services.
3. Keeping out competitive low fee passively managed funds which did not
   make revenue sharing kickbacks.
4. Causing a substantial loss over a multi-year period to each participant's
   account.

108.     Merrill Lynch, in the mid-200's transferred its family of mutual funds to

BlackRock, taking a substantial ownership in that company. Thereafter, Merrill Lynch

trumpeted:

**"Our proprietary funds are managed by BlackRock, one of the
world's largest investment management firms."**

109.     Around the same time, with its investment structure in place, Merrill Lynch

stepped out of its role of selecting the specific mutual funds for a particular Plan but continued

an investment adviser role with its "Merrill Lynch Advice Access" program. Advice Access

provided advice directly to participants and in that role, Merrill Lynch contracted with the

investment adviser Ibbotson Associates, Inc. [see Doc. 16-2 filed in this action].

110.     All of the above, BlackRock, the Plan Investment Adviser, CSIG and Advice

Access investment adviser were required to work within the Merrill Lynch scheme and

structure alleged above.

111.     Merrill Lynch was put on notice that its scheme and structure was subject to

attack under ERISA with the ruling, by the United States Court of Appeals for the Eighth

Circuit in ***Braden v. Walmart et al. 588 F.3d 585 (2009)***. This action falls within the

parameters of the *Braden* case and not the *Hecker* line of cases.

112.    As alleged below, the Merrill Lynch scheme and structure was fraudulently concealed from Plan Participants. In 2012, the DOL-EBSA finalized a disclosure rule and thereafter Merrill Lynch and Plan Sponsors struggled with the disclosure. Merrill Lynch or more properly Bank of America, did, however, end and liquidate its unregistered Equity Index Trusts. But in the Clifford Chance Plan, the scheme stayed in place with one low-fee passively managed equity index fund.

113.    The Collective Trust's Equity Index investment strategy was to seek to provide investment results that, before expenses, correspond generally to the price and yield performance of the S&P 500 Index. The fees charged to the Plan account holders of this index offering were 30 to 60 basis points—a fee charge that was more than comparable to S&P 500 Index Funds, by a factor of 3-5 times. For the entire period the Vanguard 500 Fund and the SPDR S&P 500 ETF Trust, public, registered funds, and trusts were available with much lower fees.

114.    The discontinuation of the Merrill Lynch Equity Trust was announced as follows by Merrill Lynch Wealth Management:



## **Changes to Your Plan's Investment Menu**

The trustee for the **Merrill Lynch Equity Index Trust**, Bank of America, N.A., has announced that this collective investment trust will be discontinued. This trust is one of the investment choices available to participants in the Plan.

As a result, Clifford Chance US LLP has selected a new investment choice to replace the Merrill Lynch Equity Index Trust. This new choice is the **Vanguard Total Stock Market Fund.** This investment menu change will be effective March 16, 2012.

Participant balances in the Merrill Lynch Equity Index Trust will be transferred, and future contribution elections to the trust will be redirected, to the Vanguard Total Stock Market Fund. For your convenience, descriptions of both funds, along with their Lipper classifications and gross expense ratios as of December 31, 2011, are included in this notice.

| Vanguard Total Stock Market Index Fund (Institutional Class) | Merrill Lynch Equity Index Trust (Tier XII) |
| --- | --- |
| Classification: Multi-Cap Core Funds | Classification: S&P 500 Index Objective Funds |
| Symbol: VITSX | Symbol: N/A |
| Gross Expense Ratio: 0.06% | Gross Expense Ratio: 0.20% |

115.   CSIG recommended replacing the Merrill Equity Index Trust with the Vanguard Total Stock Market Index. It specified as one of the "key drivers" of this recommendation:

> **Vanguard's expertise and proven ability in indexing**: Vanguard has dedicated significant resources to developing world-class expertise in indexing, which is evident in their consistently low tracking record.
>
> **Low Cost**: We believe that Clifford Chance should adopt "the **best practice**" of offering the lowest cost alternative "**in the index space**….Given the new pricing arrangement, the Plan can move forward **with a fund that does not share any revenue.**"

116.   The recommendation was an **<u>express admission</u>** that the previous menu offering of the Merrill Lynch Equity Index Trust for all of those years was not in the best interest of the account holders. Merrill Lynch violated its fiduciary duty over many years by using an inappropriate bias in favor of its own collective trust and one that engaged in kickbacks, as alleged above.

117.     The reference that **"given the new pricing arrangement, the Plan can move forward with a fund that does not share any revenue"** starkly shows that the Plan menu was being driven by a need for funds that paid as Merrill Lynch put it "attractive" levels of revenue sharing kickbacks. It also demonstrates that CSIG was embroiled and participating with the Merrill Lynch kickback scheme.

118.     U.S. Government, Academic, and financial industry studies literature shows the importance of low fees in selecting investments.

A.  The United States General Accounting Office, the United States Security and Exchange Commission, and the United States Department of Labor all have done studies with findings that the importance of fees or costs for mutual funds has a major adverse effect on retirement accounts over the long term of 10 or 20 years.

B.  Numerous academic journal and economist reports have similar findings on the importance of low fees.

C.  John Bogle of Vanguard and David Swenson, in charge of investing Yale University's huge endowment, have written books on the fact that most actively managed funds do not beat their index average. Both have stressed the importance of low-fee passively managed index funds as a component of any investment fund including 401k.

D.  The issue has been addressed on PBS and in the New York Post and New York Times. The latest article in the NY Times Business Section, from April 24, 2016, is entitled "**THE HIGH FEES YOU DON'T SEE CAN HURT YOU: Despite new regulations, many advisers can still offer funds that cost you and enrich them.**"

119.     Even the largest investment manager in the world, BlackRock, of which Merrill Lynch had a 49% ownership interest, recognized the importance of low-fee passively managed index investing when it acquired iShares.

120.     In June 2009, BlackRock, Inc. purchased the ETF iShares offerings from Barclays for $13.5 billion. Bloomberg reported the deal as follows:

> "The purchase, the biggest of a fund manager, creates a company overseeing $2.7 trillion in assets, more than the Federal Reserve.

> BlackRock will add about $1 trillion in investments that track market indexes, which are attracting clients at the expense of funds whose managers choose securities to buy and sell. It's the first top-ranked firm to attempt to combine both types of businesses.
>
> 'This will bring the greatest sweep of products to our clients,' Fink, BlackRock's chairman and chief executive officer, said in a telephone interview. 'This transaction is transformational.'"

121.    BlackRock's acquisition made it clear that index investment was a most

necessary and prudent choice and has been the case for over two decades.

122.    The low-fee shares of mutual funds were available to the Plan for many years.

For example:

| Lower-Cost Mutual Funds | Inception date |
|---|---|
| Vanguard Institutional Index (Instl Plus) | 7/6/1997 |
| Vanguard Prime Money Market (Instl) | 10/2/1989 |
| Vanguard Total Bond Market Index (Instl Plus) | 9/17/1995 |
| Vanguard PRIMECAP (Adm) | 11/11/2001 |
| Vanguard Developed Markets Index (Instl) | 1/22/2010 |
| Vanguard Windsor II (Adm) | 5/13/2001 |
| Vanguard Balanced Index (Instl) | 11/30/2000 |
| Vanguard Extended Market Index (Instl Plus) | 1/13/2011 |
| Vanguard Total Stock Market Index (Instl Plus) | 5/30/2001 |
| Vanguard GNMA (Adm) | 2/11/2001 |

123.    As referenced in David Swenson's book *Unconventional Success*, following the

sentence "**Lower fees produce a quantifiable advantage for investors**," Swenson set forth a

table:

| Table 8.3: Vanguard Funds Provide Substantial Cost Savings | | | | |
|---|---|---|---|---|
| *2003 Total Expense Ratios (Percent of Assets)* | | | | |
| | General Equity | World Equity | Taxable Fixed Income | Money Market |
| Lipper | 0.91 | 1.15 | 0.75 | 0.60 |
| | Total Stock Market | Total International Stock Market | Total Bond Market | Prime Money Market |

| Vanguard Investor Shares | 0.20 | 0.36 | 0.22 | 0.32 |
|---|---|---|---|---|
| | **Total Stock Market** | **Total International Stock Market** | **Total Bond Market** | **Prime Money Market** |
| Vanguard Admiral Shares | 0.15 | 0.36 | 0.15 | 0.14 |

*Source: Lipper, Inc. "Global Themes in the Mutual Fund Industry—2003"; Vanguard. Note: 2003 data reflect updates received after the publication of the initial report.*

124.    Vanguard was a leader in low fee passively managed funds, but Fidelity and Charles Schwab and others had similar offerings.

125.    Further, just as the number and magnitude of Merrill Lynch's 401k plans enabled it to achieve large revenue sharing payments, it similarly could have received the institutional low fee index offerings like the following:

| Fund | Basis Points | Fund | Basis Points |
|---|---|---|---|
| Vanguard Total Stock Market Index (Instl) (VITSX) | 5 bps | Vanguard Institutional Plus Total Stock Market Index (InstlPlus) (VITPX) | 2.5 bps |
| Vanguard Institutional Index (Instl) (VINIX) | 5 bps | Vanguard Institutional Plus Index (InstlPlus) (VIIIX) | 2.5 bps |
| Vanguard Total Bond Market Index (Instl) (VBTIX) | 7 bps | Vanguard Total Bond Market Plus Index (InstlPlus) (VBMPX) | 5 bps |

126.    Instead of low-fee passively managed index funds, the CC Plan was loaded with high fee, actively managed funds such as the following:

A.  Sample of Funds from the matrix showing the scheme, which is undated but appears to be from the period when Merrill Lynch was the investment adviser selecting the funds, included; Aim Constellation (127 basis points ("bps"); Alliance Bernstein Int'l Growth (192 bps); Allianz OPCAP Renaissance (111 bps); BlackRock Aurora (140 bps); Van Kempen Aggressive Growth (147 bps); Dreyfus Premier Balanced (93 bps).

B.  Sample of Funds from 12/31/09, when CSIG selected the funds: Thornburg Core Growth Fund Class I (117 bps); BlackRock International Opportunities Portfolio Inst. Class (131 bps); JPMorgan Small Cap Equity Fund Class A (146 bps); Buffalo Small Cap Fun Class N (101 bps); Vitrius Mid-Cap Value Fund Class A (145 bps).

C.  Sample of Funds from 12/31/11 when CSIG selected the funds: Buffalo Small Cap Fund Class N (101 bps); BlackRock Capital Appreciation Fund Inst'l Fund Class 1 (89 bps); Columbia Acorn International Fund Class Z (98); Hartford Mid Cap Fund Class R5 (88 bps); Invesco Global Real Estate Fund Inst'l Class (91 bps); Goldman Sachs Mid Cap Value Fund (76 bps); Allianz NFJ International Value Fund Instl. Class (96 bps).

127.    Low-fee passively managed index funds having fees a fraction of those basis points (BlackRock essentially advertises saying they are "1/10[th] of the cost of mutual funds" like these) were available as an alternative during the entire class period. It was an absolute fiduciary duty of Merrill Lynch, CSIG, and the Plan Sponsor to have a broad array of those low-fee index funds in the Plan- instead they ran the Plan for revenue sharing kickbacks.

128.    In February 2012, the Department of Labor published its final regulation entitled; "**Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans**."

129.    The disclosure for the Clifford Chance Plan- the "Plan Disclosure Document" in August 2012, included the following:

"**2. Administrative Expenses Information**

This section describes plan fees and expenses for administrative services charged against participant accounts that are not reflected in the total annual operating expenses of an investment. This section also describes the basis on which such charges will be allocated to, or affect the balance of, each participant's account. Plan administrative services include recordkeeping services (keeping track of participant accounts and transactions) and trustee/custodial services associated with the safekeeping of assets provided by outside service providers. Administrative services also include providing participants services such as call centers, websites, account statements and educational materials related to saving and investing for retirement.

> The Plan's service provider may receive investment-related revenue from one or more of the Plan's investment for providing the above-described administrative services. The Plan Sponsor and service provider have agreed upon 0.1150% of Plan Assets. If there is investment-related revenue and it is insufficient to meet the annual revenue requirement, the shortfall may or may not be charged to participant accounts on a pro rata basis (i.e. based upon a participant's account balance relative to total Plan assets) or a per capita basis (i.e. a flat fee for each participant account), as the Plan fiduciary chooses. These charges to participant accounts may vary from year to year and will vary based upon the actual amount of investment-related revenue received by the service provider.
>
> The Plan Sponsor may choose, in its discretion, to pay some or all of the above administrative fees and expenses from non-Plan assets, or from unallocated Plan assets such as forfeiture or suspense accounts."

130.    This same kind of "disclosure" continued through 2015. It inverts the Plan Sponsor's responsibility for paying for so-called "administrative expenses" and turns it upside down to take plan assets of participants. It gives the percentage amount but does not disclose the kickback scheme mechanism for the taking. Nor does it describe the absolute reliance on high-fee actively managed funds to provide the revenue-sharing that Merrill Lynch and the Plan Sponsor wanted; and the consequent foreclosure of competition from low-fee passively managed index funds in the Plan menu.

131.    This attempt at disclosure, however, is an express and stark admission that "Plan Assets" had been and continued to be used in the Merrill Lynch scheme and structure.

132.    After this action was filed in March 2015, additional changes were made to the Plan. In the summer of 2015, the Clifford Chance  Plan added three more low-fee passively managed index funds (bringing the total to 4):



Bank of America Corporation

## <u>Changes to Your Plans' Investment Menu</u>

*Clifford Chance US LLP Retirement Savings Plans*

Following a recent review, Clifford Chance US LLP will make several investment menu and share class changes on August 14, 2015.

**Summary of the changes**
These investment choices will be added:
- JPMorgan Equity Income Fund (51 bps)
- Vanguard 500 Index Fund (5 bps)
- Vanguard Total Bond Market Fund (7 bps)
- Vanguard Total International Stock Index Fund (14 bps)
  These investment choices will be removed:
- BlackRock Equity Dividend Fund (70 bps)
- Buffalo Small Cap Fund (100 bps)

133.     **Additionally, the CC Plan Sponsor and Merrill Lynch lowered the yearly slice of Plan Assets taken to 0.0700% of Plan Assets.**

134.     These actions admit that the Plan always should have had a bevy of low-fee passively managed index funds, and that the Plan menu offerings had been diverted to mutual funds that would pay revenue sharing kickbacks. The actions further admit, for years Merrill had been receiving Plan Assets of a substantial amount unrelated to the value of its services.

## <u>The Liability of Merrill Lynch Bank & Trust and CSIG</u>

135.     Merrill Lynch Bank & Trust FSB, as alleged above, was the trustee for the Trust under which the revenue sharing scheme was embedded and for that action is the alter ego of all the Merrill Lynch entities and part of both the Merrill Lynch Retirement Group and Bank of America Wealth Management sections committing the violations complained of herein.

136.    CSIG did the fund analysis and fund selection for a period of the class period. The claims herein do not focus on the specific fund selection, except that all selections were made within the parameters of the Merrill scheme. Accordingly, the CSIG selections consisted of high-fee actively managed funds that would pay a revenue sharing kickback to Merrill Lynch at an excessive level.

137.    CSIG knew that low fee passively managed index funds were being excluded from the Plan Menu as a result of the Merrill scheme.

138.    CSIG participated in the negotiations with respect to the level of those revenue sharing kickbacks to Merrill Lynch. CSIG knew the levels were excessive and participated in getting those levels lowered.

## ERISA'S FIDUCIARY STANDARDS

139.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, that:

> "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>    (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and]
>    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

140.    Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

> "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

141.    Under ERISA, fiduciaries that exercise any authority or control over plan assets,

including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

142.    ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants. *Bierwirth,* 680 F.2d at 271, 272, n.8.

143.    ERISA also imposes explicit co-fiduciary liability on plan fiduciaries. 29 U.S.C. § 1105(a) provides for fiduciary liability for a co-fiduciary's breach:

> "In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
> 1.   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> 2.   if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> 3.   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

144.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109. Section 1109(a) provides in relevant part:

> "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

## V. CLASS ACTION ALLEGATIONS

145.     This action is brought as a class action by Plaintiff in a representative capacity on behalf of the Plan and the Plans, as well as the following proposed class ("Class") and sub-class ("Sub-Class"):

## Class

All employee pension benefit plans covered by the Employee Retirement Income Security Act of 1974 subject to Internal Revenue Code §§ 401(a) or 401(k) with which Merrill Lynch has maintained a contractual relationship based on a Merrill Lynch trust agreement.

## Sub-Class

The CC Plan for the benefit of all participants and beneficiaries of the CC Plan

146.     Excluded from the Class and Sub-Class are Defendants, any employee pension benefit plans for which Merrill Lynch's directors, officers or employees are beneficiaries and any employee pension benefit plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary. The claims in this action are asserted with respect to the period six years preceding the initiation of this proceeding and continuing thereafter.

147.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

148.     **Numerosity**. Plaintiff is informed and believes that there are at least hundreds of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

149.     **Commonality**. There are numerous questions of fact and/or law that are common to the Plan and all the members of the Class and Sub-Class, including, but not limited

to the following:

(a)     whether Defendants have acted and continue to act as fiduciaries under ERISA in connection with the conduct described herein;

(b)     whether Merrill Lynch has engaged in prohibited transactions by receiving the revenue sharing payments for their own benefit, or otherwise earned excessive compensation and effectively charging excessive fees for the administrative, management and investment services it provides to the Plans;

(c)     whether Defendants have breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans, by charging the Plans excessive fees and/or by failing to ensure that the fees and expenses of the Plan were fair and reasonable;

(d)     whether Merrill Lynch has failed to disclose or inform the Plans and their participants of the existence and true nature of the revenue sharing payments, as well as the excessive fees and compensation received by Merrill Lynch and/or charged to the Plan and its participants; and

(e)     whether and what form of relief should be afforded to the Class and the Sub-Class.

150.    **Typicality** The CC Plan , has claims that are typical of all of the members of the Class Plaintiff's claims arise out of the same uniform course of conduct by are applicable as to all other members, respectively, of the Class and Sub-Class.

151.    **Adequacy of Representation**. Plaintiff will fairly and adequately represent the interests of the members of the Class and Sub-Class. Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class and Sub-Class.

152.    **Predominance**. Common questions of law and fact predominate over questions affecting only individual members of the Class and Sub-Class, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each member of the Class and Sub-Class, the calculation of which will ultimately be a ministerial function and which does not bar certification.

153.    **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the members of the Class and Sub-Class are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of the Class and Sub-Class members would be too small to economically justify individual litigation given the complexity of the issues in this case. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

154.    **Manageability**. This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to Class members and  the Sub-Class  would be essentially a ministerial function.

155.    Defendants have acted on grounds generally applicable to the Class and Sub-Class, respectively, by uniformly subjecting Class and Sub-Class to the revenue-sharing scheme and other conduct described above, which scheme Defendants clearly intend to continue to

perpetrate in the future. Accordingly, injunctive relief, as well as legal and/or equitable

monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory

relief, are appropriate with respect to the Class as a whole.

## COUNT I

### (Violation of ERISA's Prohibited Transaction Rules And For Breach Of Fiduciary Duty)

156.    Plaintiff incorporates the allegations in the previous paragraphs of this

Complaint as if fully set forth herein.

157.    Defendants are fiduciaries of the Plans under ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(a), as explained above, and are fiduciaries based on their discretion, authority and/or

control with respect to the administration, management and/or disposition of the Plans and their

assets, and their provision of investment advice for a fee or other compensation with respect to

the monies or other property of the Plans and Defendants' authority and responsibility with

respect to the administration and management of the Plans and their retirement assets.

158.    Merrill Lynch controls the selection of the mutual funds available as investment

options for the Plans and their participants, provided investment advice for compensation with

respect to these investment options when it set up the scheme and investment structure alleged,

uses its custody, control, ownership and dominion over the Trusts, as well as the accumulated

units of assets of the Plans, and uses its discretionary authority and responsibility in the

administration of the Plans to obtain revenue sharing payments from the mutual funds and to

earn other compensation from self-dealing as described above.

159.    The revenue sharing payments made by the mutual fund companies to Merrill

Lynch constitute plan assets because: (a) Merrill Lynch receives the payments as a result of its

fiduciary status or function in the trusts for the revenue-sharing payments, and because Merrill Lynch receives payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and their participants; (b) the mutual funds make payments to Merrill Lynch at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge, but also the amount of the revenue-sharing payments they have to make to Merrill Lynch); and/or (c) revenue-sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

160. Merrill Lynch is a fiduciary under ERISA § 3(21) (A), 29 U.S.C. § 1002(21) (a), with respect to the revenue sharing payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them, either directly or through its subsidiaries or affiliates, as well as self-determining its excessive compensation, as described above.

161. Merrill Lynch has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b) (1), 29 U.S.C. § 1106(b) (1), by dealing with the assets of the Plans in its own interest or for its own account.

162. Merrill Lynch has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2), by acting on behalf of third parties which have interests that are adverse to those interests of the Plans, their participants and/or beneficiaries in connection with transactions involving the Plans.

163. Merrill Lynch's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. §

1106(b)(3), in that the receipt of revenue sharing payments by Merrill Lynch amounts to and constitutes a fiduciary receiving consideration in the form of revenue sharing payments for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the or sub-accounts, and/or represented by the accumulation units. Specifically, the mutual funds deal with the Plans by accepting funds from the Trusts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans. Furthermore, as explained above, Merrill Lynch also has engaged in prohibited transactions with respect to its control over the investments in the Trusts and its earning of improper and excessive compensation through acts of self- dealing and by acting solely for its own benefit, as opposed to for the benefit of the Plans.

164.     Merrill Lynch's arranging for and retention (or the retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Merrill Lynch failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. Merrill Lynch's violations of ERISA § 406 also amount to *per se* violations of ERISA § 404.

165.     Merrill Lynch also breached its fiduciary duties by using its discretion and control over or influence with respect to the Trusts as well as their accumulation units, to

generate the RSPs and other improper compensation for its own benefit. Merrill Lynch did not

use the Trusts, and the accumulation units for the exclusive purpose of providing benefits to the

Plans' participants and their beneficiaries and defraying reasonable expenses of administering

the Plans and failed to act with the care, skill, prudence and diligence of a prudent person. As to

the revenue sharing payments themselves, to the extent they constitute Plan assets, Merrill

Lynch failed to use them for the exclusive purpose of providing benefits to participants and

their beneficiaries and defraying reasonable expenses of administering the Plans and also failed

to act with the care, skill, prudence and diligence of a prudent person. Finally, as set forth

above, Merrill Lynch breached its fiduciary duties by earning excessive compensation on its

own account.

166.    Merrill Lynch and CSIG, as set forth above, have engaged in and continue to

engage in severe breaches of fiduciary duty with respect to the investments in the Plans and

Plan, respectively, in violation of ERISA § 404, 29 U.S.C. § 1104 by failing to (a) discharge

their duties with respect to the Plans and Plan, respectively, solely in the interest of the Plans,

participants and beneficiaries, as applicable, for the exclusive purpose of providing benefits to

participants and their beneficiaries, and defraying reasonable expenses of administering the

Plans, including the CC Plan, with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims,

and (b) failing to monitor the expenses of the Plans and Plan, respectively, as well as the

performance of other fiduciaries to the Plan or Plans (as applicable) in a prudent and reasonable

manner.

167.    As a direct result of Defendants' breaches of duties, Plaintiff, as well as the

Class and Sub-Class, respectively, have suffered losses and damages.

168.    Pursuant to ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a), Merrill Lynch is liable to the Plans to credit back, disgorge and/or make restitution of all revenue sharing payments and other improper compensation received by it; or, alternatively, Merrill Lynch is liable to the Plans and the Class to pay damages or make restitution to the Plans in an amount representing the difference between the revenue sharing payments and other compensation that it received, and the reasonable fair market value of any services provided to the Plans by Merrill Lynch, while Merrill Lynch and CSIG are liable to the Class and Sub-Class, respectively, for all losses and related damages suffered by the Plans and the CC Plan, respectively, caused by their breaches of fiduciary duty.

169.    Plaintiff, the Class and Sub-Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

170.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiff, the Class and Sub-Class, respectively, seek an Order declaring that the above-described practices violate ERISA, as set forth above, and seek a permanent injunction preventing Defendants from engaging in such conduct in the future.

## COUNT II

**(For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)**

171.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

172.    In the alternative, to the extent that Merrill Lynch and CSIG are not deemed fiduciaries or co-fiduciaries under ERISA, any such Defendant is liable to the Class and Sub-

Class, respectively, for all recoverable damages and relief as a non-fiduciary that knowingly

participated in a breach of trust.

## COUNT III

### Violation of 18 U.S.C. § 1954 and N.Y. GBL Section 349

173.    Plaintiff repeats and realleges each and every allegation alleged above.

174.    The acts alleged above constitute a violation of 18 U.S.C. § 1954, "Offer,

Acceptance, or Solicitation to Influence Operations of a Plan."

175.    The acts alleged above constitute a deceptive trade practice prohibited by NY

CLS Gen Bus Section 349.

176.    Each defendant is subject to the law of New York in its business dealings.

177.    As a result of this violation, plaintiffs have been damaged.

### Fraudulent Concealment

178.    Plaintiff repeats and realleges each and every allegation alleged above.

179.    Defendants concealed and did not disclose the fee sharing scheme, and still have

not done so. Further, by foreclosing participants and beneficiaries, who are trapped by only the

menu choices in making their investments, from the choice of low fee funds, have knowingly

misled those participants.

180.    The taking of Plan Assets owned by participants triggers a fiduciary obligation

and must:

1.   Disclose the taking of Plan assets and amount.

2.   Disclose the mechanism for the taking of Plan assets.

181.    The revenue-sharing kickback from fees paid by participants was never

disclosed to participants.

182.    As a result of the fraudulent concealment, plaintiff asserts the tolling of any

statute of limitations affecting the rights of plaintiff and members of the class.

WHEREFORE, Plaintiff, on behalf of Plan, the Class and Sub-Class, demands judgment

against Defendants, for the following relief:

(a)    Declaratory and injunctive relief pursuant to ERISA § 502(a), 29 U.S.C. §

1132(a) as detailed above;

(b)    Disgorgement, restitution and/or damages as set forth above, plus all

other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA

§§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a);

(c)    Pre-judgment and post-judgment interest at the maximum

permissible rates, whether at law or in equity;

(d)    Attorneys' fees, costs and other recoverable expenses of litigation;

and

(e)    Such further and additional relief to which Plaintiff, the Class and/or

the Sub- Class may be justly entitled and the Court deems appropriate and just under

all of the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury as to all claims so triable.

Respectfully Submitted,

Dated: Pound Ridge, NY
      May 9, 2016

<u>/s/ Craig M. Walker</u>
Walker Law LLP
P.O. Box 19
Pound Ridge, NY 10576
917-880-7686
walkerlawllp@aol.com

***Attorney for Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 9, 2016, a copy of the foregoing Amended Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Plaintiff also will serve all additional defendants upon issuance of a summons for each such party. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.